**TRIPPER CORPORATION, Plaintiff,**

v.

**CHRYSLER CORPORATION; General Motors Corporation; Ford Motor Company; Bizi-Bodi Recreation Vehicles, Inc.; Mobility Industries, Inc.; and Contempo Campers, Inc., Defendants.**

No. C–77–0830 SW.

United States District Court, N. D. California.

Feb. 7, 1980.

Lawrence E. Alioto, San Francisco, Cal., for plaintiff.

James W. Walsh, Walsh & Morton, Moraga, Cal., for Tripper Corp.

James W. McKeehan, Richard A. Wood, Rhodes, McKeehan & Bernard, Fremont, Cal., for Mobility Industries, Inc.

Barry L. Bunshoft, James P. Barber, Hancock, Rothert & Bunshoft, San Francisco, Cal., for Contempo Campers, Inc.

Peter W. Davis, Stephen A. McFeeley, Crosby, Heafey, Roach & May, Oakland, Cal., for Chrysler Corp.

M. Laurence Popofsky, Stephen V. Bomse, Stephen N. Goldberg, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for General Motors Corp.

Pillsbury, Madison & Sutro, John B. Bates, James N. Roethe, San Francisco, Cal., for Ford Motor Co.

## MEMORANDUM AND ORDER GRANTING SUMMARY JUDGMENT

SPENCER WILLIAMS, District Judge.

The parties are before the court on defendants' motions for summary judgment. The court ruled after hearing on these motions granting judgment in defendants' favor with respect to certain issues and reserving its decision on the remainder. Plaintiff was directed to file copies of all further deposition excerpts on which it intended to rely. After careful consideration of the affidavits, depositions, briefs and arguments the court finds that there are no triable issues of material fact and defendants are entitled to judgment as a matter of law. For the reasons set forth below defendants' motions are granted and this action is dismissed.

### I.

In opposition to these motions plaintiff has identified five claims which comprise its complaint against the defendants for violation of Sections 1 and 2 of the Sherman Act. These claims are: (1) the General Motors/Contempo conspiracy re Central Chevrolet and Parker-Robb; (2) the Chrysler/Doten Dodge conspiracy; (3) the Chrysler/Ford/General Motors consignment or bailment agreement conspiracy; (4) plaintiff's claims against Mobility and Chrysler; and (5) the big three "lion's share" conspiracy. Among these claims the only claim arguably asserted against all the defendants is the so-called consignment or bailment agreement conspiracy. Next most

comprehensive is the so-called "lion's share" conspiracy which involves the three auto manufacturers but not the two converters. The remaining claims focus on isolated circumstances involving only one or two of the defendants.

## II.

Summary judgment is a disfavored remedy in complex antitrust cases "where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). However, this does not mean summary judgment is never appropriate in antitrust cases and the plaintiff should always be permitted to go to the jury on the basis of the allegations in the complaint. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d 620, 624 (9th Cir. 1977).

"Once the allegations of conspiracy made in the complaint are rebutted by probative evidence supporting an alternative interpretation of defendant's conduct, if the plaintiff then fails to come forward with factual support of its allegations of conspiracy, summary judgment for the defendant becomes proper." *ALW, Inc. v. United Airlines Inc.*, 510 F.2d 52, 55 (9th Cir. 1975). *See also First National Bank of Arizona v. Cities Service Co.*, 391 U.S. at 289, 88 S.Ct. at 1592. On the other hand, if the plaintiff comes forward with evidence to support its complaint, and under any *reasonable* construction of that evidence and any *acceptable* theory of law the plaintiff would be entitled to prevail, then a summary judgment cannot be granted. *Anderson v. American Auto Assn.*, 454 F.2d 1240, 1242 (9th Cir. 1972). Particularly when intent is at issue a jury should be allowed to draw its own inferences from the undisputed facts, unless all reasonable inferences defeat the claim. *Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d at 620.

## III.

During the time period relevant to this litigation all three auto manufacturers maintained bailment or consignment agreements with numerous companies engaged in the conversion of light utility vans into surfer wagons, campers and other varieties of recreational vehicles (RV's). According to the manufacturers these bailment or consignment agreements were adopted as a means whereby the manufacturers could participate in the RV craze without themselves tooling up to make the conversions. Use of local converters allowed the manufacturers to. offer vehicles customized for the special tastes of each regional market.

Plaintiff, unlike some of its competitors, did not have a consignment or bailment agreement with any of the manufacturers. It claims these agreements are illegal because they are the product of conscious parallel marketing programs. The agreements are alleged to be anticompetitive because they give pool converters an unfair advantage by providing superior availability of product, fewer expenses, and an inside track to the purchasing dealer. In plaintiff's view the law requires the auto manufacturers to make pools available to all converters or to none.

By the terms of the three auto manufacturers bailment or consignment pool agreements, vans are bailed to an approved converter who solicits orders from the manufacturer's franchised dealers. The converted van is delivered to the dealer who pays the converter for the conversion and the manufacturer for the van. Title passes directly from the manufacturer to the dealer.

Plaintiff inquired about a bailment pool from General Motors in June of 1976 and was informed at the time there was a moratorium on new pools due to a shortage in van production. When a Chevrolet representative contacted plaintiff in March of 1977, after the moratorium had been lifted, plaintiff's principals declined to meet with him. Plaintiff never applied for a Ford bailment pool, at least in part, because it did not want to incur the expense of an

audited financial statement. It's application for a Chrysler pool was turned down because it could not satisfy the credit requirements.

Assuming for the purpose of these motions that plaintiff has standing to challenge these bailment or consignment agreements this claim still must be dismissed. The only evidence plaintiff has produced to show a conspiracy is the agreements themselves. These contracts are notably similar or identical in their terms. However, proof of analogous business conduct does not support an inference of conspiracy by itself. *Independent Iron Works, Inc. v. United States Steel Corp.*, 322 F.2d 656, 661 (9th Cir.), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963). Such an inference is appropriate only where the actions taken are in apparent contradiction of the party's economic self interest or where there are circumstances which logically suggest joint agreement, as distinguished from independent action. *Joseph E. Seagrams & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 84–85 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). Plaintiff does not explain how these agreements are contrary to the parties' economic self interest or what the manufacturers might achieve by concerted adoption of the same form of consignment arrangements.

The only specific evidence in the record suggests the parallel conduct was the product of competition, not a lack thereof. Chrysler dropped its consignment program in 1974, but found it necessary to reinstate it in the same year to be competitive with General Motors and Ford. Furthermore, the pool arrangements provide demonstrable advantages to the manufacturers and their dealers. The manufacturer is able to provide its dealers with vans customized to suit local taste and to maintain some control over the quality of the conversion job while avoiding the expense of tooling up to do the conversions itself. Dealers, on the other hand, are able to obtain customized vans less expensively because the manufacturer bears the cost of flooring for some or all of the conversion period. The advantages of this system inure to the manufacturer and its dealers whether or not the other manufacturers follow suit.

A second reason why this claim must fail is that plaintiff cannot show the bailment system is an unreasonable restraint of trade. Except for those agreements or practices conclusively presumed to be unreasonable, all competitive restrictions are tested by the rule of reason. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977). The rule of reason is primarily directed to a balancing of the competitive evils of the restriction against the competitive benefits asserted on its behalf. *Gough v. Rossmoor Corp.*, 585 F.2d 381, 389 (9th Cir. 1978). In this regard the proper focus is how the restriction affects competition in the marketplace as a whole, not how it affects a particular company's position in that market. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

Plaintiff's attack on the bailment pool system is in substance a challenge to the decision of the auto manufacturers to market their new vehicles exclusively through franchised dealers, a system that has been challenged and upheld. *See, e. g., Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72 (3d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978). Rather than integrating the custom conversion of vans into their own manufacturing process the auto makers chose to utilize a number of independent converters. This choice may have been disadvantageous to plaintiff and other converters who could not qualify for a pool, but it was far less drastic than complete vertical integration would have been.

The bailment pool system fosters interbrand competition by making the locally customized van less expensive for the franchised dealer. Some intrabrand competition is also fostered because the manufacturer maintains bailment agreements with a number of different converters who must compete among themselves to offer the most desirable and least expensive conversion kit to the manufacturer's dealers.

Plaintiff cannot seriously contend the law requires auto manufacturers to bail their vans to all converters without regard to their financial stability. The court finds it equally implausible that the law gives auto manufacturers only two remaining choices—either to abandon the franchise system for the sale of new converted vans or to convert the vans themselves. So long as the auto makers may lawfully market their new vehicles through exclusive dealerships plaintiff's claim must fail as a matter of law.

### IV.

■ Paragraph four of plaintiff's amended complaint alleges General Motors, Ford and Chrysler conspired to allocate to Chrysler the lion's share of the van market. This claim must be dismissed for the simple reason plaintiff has no evidence to support it. Tripper asserts that Chrysler enjoys only about 12% of the automotive market, but garnered about 45% of all van sales in California during the years covered by this litigation. This fact does not support any reasonable inference of conspiracy.

The undisputed evidence is that demand for vans during the mid-70's far exceeded supply. Ford Motor Company's only van producing plant was operating at full capacity for the entire period, and the shortage of Ford vans did not lessen until a new plant was opened in Ontario. The only reasonable inference to be drawn from the evidence before the court is that Chrysler better anticipated or responded to the sudden surge in demand for light utility vans than did Ford or General Motors.

### V.

The first of the two alleged individual conspiracies to interfere with plaintiff's source of vans involves General Motors and Contempo. Up until June of 1976 plaintiff succeeded in obtaining a regular supply of Chevy vans from two dealers, Central Chevrolet and Parker-Robb Chevrolet, under phony fleet account arrangements. Late in June of 1976 General Motors began rigidly enforcing its fleet account restriction, and as a result plaintiff was no longer able to obtain the same number of Chevy vans from these dealers. It is a disputed issue of fact whether General Motors was moved to take this action because of complaints brought by Contempo, a competitor converter who had a Chevy pool.

As a part of its marketing strategy General Motors allocates new vehicles among various accounts. The dealer obtains a regular allotment from which most of his sales are made. However, he may draw upon the regional fleet allotment to fill the orders of certain purchasers who qualify as fleet accounts. It is the policy of General Motors to limit fleet sales to end-users. Plaintiff contends this restriction is an unlawful vertical customer restriction whose purpose is to keep converted Chevy vans off lots of other manufacturers' dealers.

Customer restrictions are not per se unlawful, rather they must be judged by the rule of reason. *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. at 49–50, 97 S.Ct. at 2557. In the only reported case involving General Motor's fleet allotment system the restriction has been upheld based upon the lack of any evidence the distribution system is unreasonable. *National Auto Brokers Corp. v. General Motors Corp.*, 572 F.2d 953, 960 (2nd Cir. 1978). Likewise, plaintiff here has produced no evidence to demonstrate the practice resulted in a lack of competition either among Northern California Chevy dealers in the sale of Chevy vans or among Northern California Chevy, Ford and Chrysler dealers in the sale of vans generally. Apart from this lack of evidence, it would appear defendants must prevail as a matter of law because the fleet account limitation is far less restrictive than General Motor's lawful practice of granting geographically spaced, exclusive dealerships. It follows as well, that if the fleet account limitation to end users is lawful, Contempo's instigation of the policy's enforcement is irrelevant.

### VI.

■ The second alleged individual conspiracy to interfere with plaintiff's source

**512**

of vans involves Chrysler and one of its dealers (Doten Dodge), who is not a defendant in this action. The claim arises from plaintiff's breach of an unwritten agreement with Doten whereby plaintiff had promised not to resell any of the vans it purchased without converting them. In June of 1977 plaintiff sold two unconverted Dodge vans to Empire Chevrolet. A local Dodge dealer complained to the Chrysler zone manager about the new Dodge vans sitting on the Chevy dealer's lot because he was unable to obtain new Dodge vans himself. The zone manager traced the serial numbers to Doten Dodge. According to his testimony he contacted Doten about the vans because he was concerned there might be some financial problem with the dealership. Doten's general manager responded angrily to the news that Tripper had resold unconverted vans and refused to deal with plaintiff for the next six months.

Plaintiff claims Doten's refusal to deal was the product of an unlawful customer restriction dictated by Chrysler. The court has some doubts whether plaintiff has standing to raise this claim since the restriction involved the sale of unconverted vans which was not plaintiff's business. Assuming plaintiff can raise the claim, however, it is still without merit. Chrysler has produced substantial, sworn, reasonable and believable testimony that the sales restriction was the product of Doten's independent business policy and that Chrysler had no part in the formulation of the policy or its enforcement. Against this evidence plaintiff would have the court find a triable issue of material fact from a pyramid of inferences built upon a statement made by the Doten manager that "heat was flying all over hell and a half acre" or that he was "getting heat he could not handle." The court declines to find any reasonable inference of conspiracy in plaintiff's stack of cards especially because Tripper's total supply of Dodge vans was not decreased and there is no evidence Chrysler urged any other dealer to refrain from dealing with the plaintiff. Furthermore, since plaintiff has no evidence to show the sales restriction was a general Chrysler policy it is also

doubtful whether plaintiff could show the refusal to deal was intended to or did bring about some restraint of trade beyond its own loss of business. *See Knutson v. Daily Review, Inc.,* 548 F.2d 795, 803 (9th Cir. 1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977); *see also Golden Gate Acceptance Corp. v. General Motors Corp.,* 597 F.2d 676 (9th Cir. 1979).

### VII.

Plaintiff asserts several vaguely defined claims against Mobility. The first claim, an alleged breach of fiduciary relationship of co-adventurers, is easily dismissed because the claim is not plead in the complaint, neither of the alleged co-adventurers is a party to this action, and Mobility was not in existence when the alleged breach occurred. The second, antitrust claim involves an alleged market foreclosure arising from the fact the same individual who owns a controlling interest in Mobility also owns several Dodge dealerships in the Bay Area.

Unlike plaintiff's other claims this one involves alleged restraints on the sale of converted vans rather than interference with plaintiff's source of supply. Plaintiff's theory is that the common ownership amounts to a combination in restraint of trade or a combination to monopolize trade in the sale of converted vans.

Chrysler's role in the alleged unlawful combination is somewhat difficult to ascertain. There is no corporate relationship between Chrysler and Mobility or Chrysler and Hank Torian's dealerships, therefore any antitrust liability for Chrysler must arise simply from the fact it granted the franchises to Hank Torian and approved the Mobility pool. The court is unable to discern any restraint of trade arising from the fact one individual owns controlling interests in a converter and several dealerships. Similarly, the court is unable to find an inference of conspiracy to monopolize trade based on the same facts.

Plaintiff's case against Mobility is no stronger. There is no evidence in the rec-

513

ord from which the trier of fact could find that Mobility has monopolized or attempted to monopolize the van conversion market.

## VII.

For the reasons given above, and for other good cause appearing IT IS HEREBY ORDERED that defendants' motions for summary judgment be granted and this action be dismissed.