**SAUSALITO PHARMACY, INC., et al., Plaintiffs,**

v.

**BLUE SHIELD OF CALIFORNIA, et al., Defendants.**

**No. C–78–2196 RFP.**

United States District Court, N. D. California.

March 16, 1981.

Morrison & Foerster, McCutchen, Doyle, Brown & Enersen, John E. Hurley, Jr., Meredith J. Watts, San Francisco, Cal., Gibson, Dunn & Crutcher, Los Angeles, Cal., Shartsis, Friese & Ginsburg, San Francisco, Cal., Adams, Duque & Hazeltine, Los Angeles, Cal., Hassard, Bonnington, Rogers & Huber, San Francisco, Cal., for Blue Shield of California.

Knight, Boland, Riorden, San Francisco, Cal., Martin Schnitzer, Memel, Jacobs, Pierno & Gersh, Los Angeles, Cal., for defendants.

Reuben J. Becker, Sausalito, Cal., Richard J. Archer, and Jordan D. Luttrell, Sullivan, Jones & Archer, San Francisco, Cal., for plaintiffs.

## MEMORANDUM AND ORDER

PECKHAM, Chief Judge.

Defendants in this antitrust action have moved this court for summary judgment on the issue of their liability under Section 1 of the Sherman Act and the corresponding section of the Cartwright Act. This court, having heard oral argument on the motion on December 22, 1980 and having fully con-

sidered all matters herein, decides to grant the motion with respect to all defendants in the action. In addition, defendant Blue Shield renewed its motion for summary judgment on the grounds that its agreements are exempt from the antitrust laws under the state action exemption set forth in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). As we grant the motion for summary judgment on the merits, we do not reach a decision on Blue Shield's claim of state action immunity.

## I. BACKGROUND

### A. *Factual*

Plaintiffs in this antitrust action are challenging the legality of prepaid prescription drug plans administered or underwritten by the defendants. The plaintiffs are independent retail pharmacies which participate in defendants' prepaid drug plans.

The defendants—insurance companies and plan administrator companies—maintain two separate agreements for each plan. The first agreement is between the insurance company and the insured. Although the terms vary from plan to plan, generally they provide that the insured will pay a certain deductible (or copayment) of the cost of prescription drugs and the insurer will pay the rest. The amount of the deductible varies among the defendants and among the plans maintained by each defendant as well. In order to receive the benefit of the agreement, the insured must purchase from a pharmacy which participates in the prepaid plan with the insurance company. If the insured chooses to purchase his drugs elsewhere, he must pay the entire purchase price; he is, however, generally entitled to reimbursement from the insurer. The amount of reimbursement differs from plan to plan.

The second agreement is between the pharmacy and the insurer (or the pharmacy and the plan administrator if the insurance company does not administer its own plan). Each agreement contains three price components. The first, the deductible or copayment, is collected by the pharmacy from the insured. Under the pharmacy agreement, the pharmacy may not charge the insured any more than this amount. The second component—the ingredient cost—is determined by market constraints and generally equals or exceeds the participating pharmacies' actual acquisition cost for the prescription drug from its suppliers. This amount is paid directly to the pharmacy by either the administrator or insurer. The final price component, the dispensing fee, in effect, attempts to reflect a reasonable profit for the pharmacy. This amount also varies from plan to plan and is determined by market constraints.

The pharmacy agreements are prepared by the insurance companies and are presented to the pharmacies on a take-it-or-leave-it basis; the member pharmacies and the insurance companies do not negotiate the terms of the contract. The pharmacies are free, however, to choose among the various existing plans offered by the different insurance companies. Some insurance companies do not administer their own plans; in that case, the administrator deals directly with the pharmacy. The terms of the plan and the amounts of the price components, however, are in all cases set by the insurance companies.

### B. *Procedural*

In October of 1979, plaintiffs moved for summary judgment on the grounds that the pharmacy agreements were *per se* violative of Section 1 of the Sherman Act. We deferred ruling until a decision was issued in *Group Life & Health Insurance Co. v. Royal Drug*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) in which the Court considered whether substantially similar insurer pharmacy agreements were within the "business of insurance" exception to the Sherman Act and therefore exempt from scrutiny. Holding that such agreements were not within the "business of insurance" exception, the Court characterized these agreements as "arrangements for the purchase of goods and services by [the insurer]." 440 U.S. at 214, 99 S.Ct. at 1075. Relying on this characterization, we denied plaintiffs' motion for summary judgment,

holding that contracts between a purchaser [insurance company] and seller [pharmacy] are not the sort of price fixing agreements that are *per se* illegal under the Sherman Act. We further held that such agreements were to be scrutinized under the rule of reason standard.

In the same order, we considered defendant Blue Shield's motion for summary judgment on the grounds of state action immunity. In denying this motion, we held that the second criteria in establishing immunity—the policy must be actively supervised by the state itself—was not sufficiently established. Blue Shield again moves for summary judgment on the ground of immunity by virtue of state supervision.

Plaintiffs, in their complaint, alleged several antitrust violations. They are proceeding now, however, only with respect to their claims under Section 1 of the Sherman Act (and corresponding sections of the Cartwright Act). Plaintiffs allege both vertical and horizontal violations.

## II. DISCUSSION

### A. *Introduction*

Section 1 of the Sherman Act provides, in relevant part:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

Defendants contend that the pharmacy agreements at issue are *per se* legal under the act. While this characterization may be somewhat inaccurate as all contracts are tested under the rule of reason for the extent of their anticompetitive effect and are therefore not *per se* legal, we assume that defendants mean that, as a matter of law, these contracts do not amount to *unreasonable* restraints of trade.

■ Plaintiffs continue to argue that the defendants are not purchasers of the prescription drugs in that they never take title, possession, use or any other ownership interest in the drugs. Thus, plaintiffs again seek to characterize the customer-benefi-

ciary as the "purchaser" of the drug. In response to this argument, we reiterate our ruling in the May 12, 1980 Memorandum and Order denying plaintiffs' motion for summary judgment: the Supreme Court's characterization in *Royal Drug, supra*, of virtually identical agreements as "arrangements for the purchase of goods and services" was not mere *dicta* but was essential to the outcome of the case, and therefore dictates the view which this court must adopt. We therefore hold that the pharmacy agreements at issue here constitute agreements between the buyers and sellers of goods. This holding applies equally to agreements between pharmacies and insurance companies and those between pharmacies and plan administrators for the reasons set forth in our prior order. (*See* Memorandum and Order of May 12, 1980, p. 5).

### B. *Vertical Restraints of Trade*

■ The thrust of plaintiffs' first charge is that the contracts vertically fix prices in two ways: (1) the agreement fixes the amount of copayment or deductible which the pharmacy may collect from the customer-beneficiary; and (2) the agreement fixes the total price which the pharmacy may collect from the insurance company at an amount other than the pharmacists' usual and customary rate. With respect to the first method of alleged price-fixing—the fixing of the deductible—we held in our prior memorandum that the "price" which is "fixed" in the participating pharmacy agreements is not the amount of the deductible but rather the amount of ultimate reimbursement to the pharmacy by the insurance company. We have no reason to diverge from that view now. As we noted in our prior order, the amount of the deductible is not set in the participating pharmacy agreement, but rather in the agreement between the insurer and the beneficiaries. The prohibition against charging the beneficiary more than the deductible is merely the mechanism utilized by the insurance companies to apply their deductibles in prepaid drug transactions. Thus, while the price of the drugs is indeed "fixed" by the

agreements, the deductible is not that price; the price "fixed" in the pharmacy agreements is the cost of the drug plus the dispensing fee. In analyzing plaintiffs' claim of vertical restraint of trade, we proceed therefore only with respect to plaintiffs' allegation that the agreement fixes the total price which the pharmacy may collect from the insurance company.[1]

 It is well established that vertical agreements may be violative of the Sherman Act if they fix prices to be charged third parties. As the Third Circuit stated in *Sitkin Smelting & Refining Co. v. F. M. C.*, 575 F.2d 440 (3d Cir. 1978):

> The price fixing within the scope of the *per se* prohibition of section 1 is an agreement to fix prices to be charged in transactions with third parties, *not between the contracting parties themselves.*

575 F.2d at 446. As this contract does not set prices to be charged third parties, the issue to be decided is whether these agreements are *unreasonable* vertical restraints of trade. Analysis of the applicable case law reveals a variety of different approaches to this question. No matter which we take, however, the conclusion that the agreements do not violate the rule of reason is inescapable.

First, it should be noted that no case has directly considered whether pharmacy agreements, like those at issue here, violate the antitrust laws. The Supreme Court in *Royal Drug* only decided that such agreements did not come within the "business of insurance" exception. The Court did take notice, however, of the position of the Antitrust Division of the Department of Justice that pharmacy agreements do not violate the Sherman Act.

There does exist, however, significant case authority which has considered the le-

gality of similar provider agreements under the antitrust laws. In the case most directly on point, the court granted summary judgment in favor of the insurance company. In *Blue Cross & Blue Shield v. Michigan Association of Psychotherapy Clinics*, 1980—2 Trade Cas. ¶ 63,351 (E.D.Mich. 1980), the provider agreement established that the out-patient clinics ("OPC") would furnish mental health services covered by Blue Cross plans to "any eligible member" and would look solely to Blue Cross for reimbursement in accordance with ceiling rates and policies established by Blue Cross. The agreements also provided that the reimbursement would be limited to the lesser of the provider's normal billing rate for such services or the applicable ceiling rate set by Blue Cross.

The OPCs claimed two price-fixing violations. First, they argued that the agreement fixed prices for services provided to Blue Cross members. In response to this claim, the court stated:

> While the agreements between [Blue Cross] and participating OPC's set the maximum price which [Blue Cross] will pay for covered services rendered to its members, this clearly is not a violation of anti-trust laws. [Blue Cross], as a purchaser of health care services for its members, and participating OPC's as sellers of those services, are not prohibited by anti-trust statutes from contractually fixing a sale price for the purchase of a commodity between themselves.

1980–2 Trade Cas. ¶ 63,351 at 75,794. Second, the OPCs argued that the agreements effectively set the ceiling rates that OPCs could charge nonmembers of Blue Cross. The court found as a matter of fact that no such compulsion existed.

> The provider agreements do not control any sale other than the one between the insurance company and the pharmacy. The insurance company, as purchaser of the drugs, has in no way restricted the price at which the pharmacist may sell to third parties. Indeed, the provider agreements do not even contemplate resale.

---

1. At oral argument, plaintiffs likened this scheme to one involving resale price maintenance; that is—where a wholesaler seeks to control not merely the prices at which its agent may sell its products, but also the prices for all sales by all dealers at wholesale or retail. *Dr. Miles Medical Co. v. John D. Park & Sons*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). This court is unable to accept this analogy.

■ The court in *Michigan Association* also recognized that practices which are not *per se* violative of the Sherman Act may be violative if, under the rule of reason standard, they effectively restrain commerce. In this regard, the court stated:

> However, the only antitrust violation alleged ... is that the contracts between [Blue Cross] and the participating OPC's constituted price-fixing agreements; *[OPCs] assert no other effect on price formation, or other type of restraint of trade, independent of what the contract terms above require* .... Since the Court has determined that no compulsion [to charge non-Blue Cross members rates equivalent to Blue Cross ceiling rates] exists under the terms of the contract, they are not price-fixing agreements as [the OPCs] allege and summary judgment [for the insurer] is appropriate.

*Supra* at 75,795. Thus, the court in *Michigan Association* has taken the position that the contract, insofar as it is merely an agreement between a purchaser and seller of services and does not fix prices outside of those agreed upon in the contract itself, does not violate the rule of reason. Similarly, in the present case, apart from the claims of horizontal conspiracy which will be discussed later, plaintiffs allege "no effect on price formation independent of what the contracts require." In listing what they consider to be disputed facts to be resolved under the rule of reason standard, plaintiffs do not enumerate any effect on price levels except that, as a result of the contract, they are unable to obtain the same profit margin as they do from "cash and carry" customers. The failure to make more money, however, is simply not the kind of problem which the antitrust laws address. Quite the contrary, the primary goal of the antitrust laws is consumer welfare, not competitor welfare. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977).

In our view, under the reasoning of the court in *Michigan Association* on the issue of the vertical restraint imposed by the provider agreements, summary judgment in favor of the defendants is appropriate. Indeed, plaintiffs in the present case do not even attempt to distinguish *Michigan Association* but urge instead, without further argument, that it was wrongly decided. We cannot agree.

Another approach in determining the legality of similar agreements under the rule of reason standard is found in *Quality Auto Body, Inc. v. Allstate Insurance Co.*, 1980–2 Trade Cas. ¶ 63,507 (N.D.Ill.1980). In that case, informal vertical arrangements existed between insurance companies and automobile body shops under which shops would follow insurance company guidelines for repair rates in exchange for being placed on lists of preferred body shops. In some circumstances, the insurance company might negotiate the price with a body shop that had indicated that it could not do the work for the price set forth in the original estimate developed by the insurance company. If agreement with the shop could not be reached, the customer could still deal with that shop but would be required to personally make up the difference between the price charged by that shop and the price listed in the insurance company guidelines.

In analyzing whether such agreements impermissibly fix prices, the court first characterized the agreement as a contract between seller and buyer, and noted that, as such, it cannot constitute a *per se* violation unless it contains restriction on one parties' activities other than those involved in the sale itself (such as resale price control). The court concluded that no such restraints were present in the agreements with the body shops. Next, the court determined that the rule of reason standard was applicable to test the legality of such agreements, recognizing that the Supreme Court in *Royal Drug* had indicated that such agreements might have anticompetitive effects. Because the Supreme Court did not set forth any tests for evaluating such effects, the court in *Quality Auto Body* developed the following guidelines:

> The question, then is whether the alleged agreements between each of the defendants and various "preferred" shops are in

fact abuses of the defendants' buying power .... This court concludes that the plaintiff's burden of proving that the provider agreements unlawfully restrain trade would be satisfied if it could be shown that there exists a conspiracy between the defendants to fix prices, or a conspiracy to boycott the plaintiff's business, and *if the provider agreements are a means of implementing those conspiracies. The court also concludes that absent proof of price fixing or of a boycott, the provider agreements are nothing more than contracts between buyer and seller determining the price of services that the seller will perform, and are not illegal.*

*Supra,* at 76,696 (emphasis added). In *Quality Auto Body,* the court found no evidence of any unlawful combination and therefore granted summary judgment in favor of defendants, holding that, as a matter of law, the agreements did not violate the Sherman Act.

Thus, following the test set forth in *Quality Auto Body,* our determination of the legality of the vertical arrangement depends on our findings on the claim of an illegal horizontal conspiracy. As will be discussed more fully later, this court finds that no triable issue of fact exists with regard to the existence of an unlawful conspiracy or combination. Summary judgment is therefore appropriate under this theory as well.

Plaintiffs attempt to distinguish *Quality Auto Body* in two ways. First, plaintiffs argue that, unlike the present case, there were no agreements between the insurance company and the auto body shops in *Quality Auto Body.* While the agreements in that case may have been informal, the court explicitly assumed that such agreements existed for purposes of the summary judgment motion. The court stated:

> To summarize: the court assumes, for the purposes of this motion, that each of the defendants has entered into various agreements regarding the price of auto repair with various "preferred shops."

*Supra,* at 76,697. Second, plaintiffs contend that *Quality Auto Body* is distinguishable because "there were individual negotiations conducted for each repair job." This is not exactly correct; as stated above, there was apparently, "in some circumstances," negotiations between Allstate and a shop if the shop could not do work for the price set forth by Allstate. Allstate, however, was not the only defendant. Moreover, while this may distinguish the case factually, we do not think it vitiates the applicability of the court's reasoning to the present case. In discussing the rule of reason standard, the court in *Quality Auto Body* did not *once* mention the possibility of independent negotiation as a factor which would point to the *reasonableness* of the defendant's conduct. Further, the court was determining the validity of an agreement between the preferred shops and the insurance company; it did not rule on the legality of defendant's conduct with shops with which it did not have an agreement. And finally, the holding and test developed by the court is sufficiently broad to nullify any effect which this difference in detail might have; that is—we think that the court's concern in *Quality Auto Body* for conspiratorial conduct overshadows the import of the possibility of individual negotiations.

A third approach involves the application of a general rule of reason standard to the present facts. In *Sitkin Smelting & Refining Co. v. F. M. C. Corp.,* 575 F.2d 440 (3d Cir. 1978), plaintiff sued F. M. C. alleging that defendant, pursuant to an illegal agreement, awarded the contract for purchase of scrap metal to a lower bidder than plaintiff. Plaintiff thus argued that F. M. C. had conspired with the lower bidder (Krentzman) to fix prices. The court noted first that no *per se* violation had occurred as there was no agreement to fix the price charged to third parties. Turning to the rule of reason standard, the court stated:

> The basic principle of the rule of reason, well-articulated in *Chicago Board of Trade v. United States,* 246 U.S. 231 [38 S.Ct. 242, 62 L.Ed. 683] (1918), is that contractual restraints fall within the prohibition of § 1 only when their purpose

and effect is found to have imposed an undue restraint on commerce.

575 F.2d at 447.

Applying this standard to the present case, it is clear that the agreements were not intended to fix prices of prescription drugs for all consumers. Indeed, plaintiffs neither argue nor allege this. Moreover, as in the *Sitkin* case, the plaintiffs do not allege, and the record does not reflect, any intent to affect quantity or quality of prescription drugs or services.

This is not to say that provider agreements could never be used in a manner which restrains trade. In the Amicus Brief filed by the Department of Justice in *Royal Drug*, the government sets forth several examples of situations presenting possible illegal restraint of trade. For instance, the government considers the most troublesome opportunity for a restraint of trade to exist if the pharmacies also controlled the insurance companies. In such a scenario, the pharmacies could agree to increase prices and carry out the agreement through their control of the insurers. The government also notes that provider agreements might violate the antitrust laws if the evidence revealed that the participating pharmacies conspired among themselves to obtain a price for distribution higher than they would otherwise obtain. Last, the government recognizes that a genuine antitrust concern would exist if it could be established that the participating pharmacies are using the pharmacy agreements to engage in predatory pricing. While this court recognizes that this list is not exhaustive of all possible arrangements which might violate the antitrust laws, it is instructive to note that none of the scenarios depicted by the government remotely resembles the facts at hand—insurance companies acting unilaterally in offering pharmacy agreements to pharmacies for their voluntary acceptance.

■ Regarding the effect of the agreements, plaintiffs are unable to point to any fixing of prices of prescription drugs other than the amount they collect under the contract. They do not allege that the pharmacy agreements constrains the price at which they may sell prescription drugs to "cash and carry customers" nor do they allege that the agreements affect the price structure of the prescription drug market in general. As we stated earlier, contracts between purchasers and sellers do not impermissibly restrain trade unless there is some effect on price formation other than the terms of the contract itself. *See Blue Cross & Blue Shield v. Michigan Association of Psychotherapy Clinics, supra.* Indeed, plaintiffs are unable to cite any authority suggesting that purchase and sale contracts restrain trade because the seller later decides he wants more money than he originally contracted to receive.

In conclusion, the evidence is uncontroverted that the pharmacy agreements were not entered into with the intent to control market prices, impose undue limitations on competitive conditions, or unreasonably restrict competitive opportunity. In fact, as pharmacies are free to enter into provider agreements with as many insurance companies as they desire, it is quite possible that such agreements engender competition for the business of the numerous customer-beneficiaries. Moreover, plaintiffs can point to no effect of the agreements which impose an undue restraint on trade. As such, under the test developed by the court in *Sitkin*, summary judgment in favor of the defendants is appropriate.

In short, plaintiffs are unable to produce any evidence which would establish an impermissible vertical restraint of trade under any existing legal theory. This court is not unmindful, however, of the strong policy against granting summary judgment in favor of the defendant in antitrust cases "where motive and intent play leading roles." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Except for the *Sitkin* approach which requires some inquiry into factors of motive and intent, plaintiffs' principal argument in the present case is that the agreement on its face evidences an illegal vertical restraint of trade. Motive and intent are, therefore, merely minor characters in this action.

Moreover, the Supreme Court has recognized that disposition of an action through summary judgment is not to be read out of antitrust cases altogether. In *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Court stated:

> While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial *notwithstanding the absence of any significant probative evidence tending to support the complaint.*

391 U.S. at 290, 88 S.Ct. at 1593.

In the present action, viewing the evidence in a light most favorable to the plaintiff, this court is unable to find a genuine issue as to any material fact which would support plaintiffs' claim that the provider agreements vertically fix prices in violation of Section 1 of the Sherman Act. In their brief opposing summary judgment, plaintiffs list the following questions which they contend are triable issues of fact and preserve their right to trial on the merits on the vertical restraint theory.

> There is a disputed issue of fact as to whether defendants are purchasers of drugs from plaintiffs. There is a disputed issue of fact as to whether defendants' restraints on the transactions between the participating pharmacist and his patient constitute price-fixing in violation of Sherman Act § 1.

. . . .

Further, plaintiffs are entitled to show the unreasonableness of defendants price-fixing restraints to a jury. The evidence presented by plaintiffs by declaration show the unreasonableness of defendants' restraints.

Plaintiffs' Opening Brief, p. 19. The first two questions listed by plaintiffs as "disputed issue[s] of fact" are clearly questions of law, the first of which was resolved in *Royal Drug* and has already been discussed in this Memorandum and Order. The second question above is, of course, the ultimate legal question to be decided in this case.

■ Plaintiffs' next contention is that they are entitled to a jury trial on the question of the reasonableness of the provider agreements. Analysis of the case law reveals, however, that summary judgment is proper where there are no disputed issues of material fact, regardless of whether the relevant standard is *per se* or rule of reason. Indeed, the Ninth Circuit has recently upheld the granting of summary judgment in defendant's favor when the applicable test was the rule of reason. *Mutual Fund Investors, Inc. v. Putnam Management Co.*, 553 F.2d 620 (9th Cir. 1977). *See also Quality Auto Body, Inc. v. Allstate Insurance Co.*, 1980-2. Trade Cas. ¶ 63,507 (N.D.Ill. 1980); *Blue Cross & Blue Shield v. Michigan Association of Psychotherapy Clinics*, 1980-2 Trade Cas. ¶ 63,351 (E.D.Mich.1980). Moreover, the several factors which plaintiffs enumerate to show the unreasonableness of the provider agreements merely establish that plaintiffs do not realize as much profit under the pharmacy agreements as they do from sales to "cash and carry customers."[2] As we have stated be-

---

**2.** Plaintiffs list the following several factors as establishing the unreasonableness of "defendants' restraints":

a. That the average gross margin of a prescription sale in California is $4.85, far more than the highest dispensing fees offered in defendants' plans. . . .

b. That despite the lower gross margins for sales to patients covered by defendants' plans, pharmacists provide substantially identical services to both cash and carry patients and prepaid patients. These additional personal services provided by pharmacists

range from individual consultation to delivery of prescriptions and other services . . . .

c. That plaintiffs compete on the basis of individualized service to their patients and that the substantially diminished profitability of sales to prepaid patients will lead to the termination of such service . . . .

d. That the artificially low dispensing fees fixed by defendants cause the plaintiffs to charge their cash and carry patients more than would be the case if defendants did not fix fees . . .

fore, the failure to make more money, without more, simply does not state a claim under the antitrust laws. As the Third Circuit recognized in *Sitkin Smelting & Refining Co. v. F. M. C. Corp., supra,* the Sherman Act is not a panacea for all commercial activity which appears to some party to be unfair or unjust.

On the basis of the arguments and affidavits submitted by the parties to this action, this court concludes that no triable issue of fact exists which, under an acceptable interpretation of Section 1 of both the Sherman Act and Cartwright Act, would support plaintiffs' claim for relief. We thus grant summary judgment in favor of defendants on plaintiffs' claim that the participating pharmacy agreements impose an impermissible vertical restraint of trade.[3]

## C. *Horizontal Conspiracy*

The evidence is undisputed that the insurance companies and the plan administrators did not agree to a particular set of prices in the provider agreements. Each defendant has submitted affidavits to that effect and plaintiffs do not dispute their credibility or veracity.[4] Indeed, plaintiffs have abandoned their argument that defendants explicitly agreed to fix prices in the pharmacy agreements and urge instead two novel theories which, they contend, support a finding of an illegal implied conspiracy.

1. *Analysis of the agreements on their face.* Plaintiffs argue that the agreements

e. That as a result of defendants' price-fixing, cash and carry patients must subsidize the prepaid patients....

f. That defendants have alternative to their price-fixing scheme in the form of a usual and customary fee reimbursement system and they have the capacity to administer such a system....

To the extent that plaintiffs claim to be forced to charge cash and carry customers more in order to obtain a certain overall profit, we note that that is a business decision to be made by plaintiffs upon their entering into a contract with defendants. As such, it does not establish a price fixed for third parties by defendants nor can it be said to be an unreasonable effect on defendants' conduct.

3. Several recent cases, either through *dicta* or express holding, support the result reached by

on their face evidence an implied combination in violation of the Sherman Act. To some extent, we ruled against this theory in our prior order. There we stated:

Plaintiffs also contend that the agreements on their face reveal a conspiracy among defendants to fix prices, but the evidence uncovered to date does not support this charge. The precise terms of the various plans differ, and plaintiffs have failed to produce any evidence of a horizontal conspiracy.

Memorandum and Order, May 12, 1980, p. 3. Nevertheless, plaintiffs reiterate the charge that the pervasiveness of the scheme fixing a maximum dispensing fee and maximum deductible evidences a conspiracy. In support of their argument, plaintiffs cite two cases which are either irrelevant or distinguishable from the present case.

Plaintiffs first cite *Matter of Cement Institute,* 37 F.T.C. 87 (1943), *vacated sub nom. Aetna Portland Cement v. F. T. C.,* 157 F.2d 533 (7th Cir. 1946), *reinstated sub nom. F. T. C. v. Cement Institute,* 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948) in which the plaintiff charged that the 74 cement manufacturers, wholesalers and distributors hindered and restrained competition through a mutual understanding to employ a multiple base point system of pricing. This system, it was alleged, resulted in the quotation of identical terms of sale and identical prices for cement by the 74 corporations regardless of their location in the United States.

this court on the issue of vertical restraint of trade. *See e.g., Webster County Memorial Hospital v. United Mine Workers,* 536 F.2d 419 (D.C.Cir.1976); *Arkansas Pharmacist Association v. Harris,* 627 F.2d 867 (8th Cir., 1980); *Proctor v. State Farm Mutual Automobile Insurance Co.,* No. 249–72, Slip Op. (D.D.C., Oct. 23, 1980).

4. Although this court is normally hesitant to grant summary judgment for defendants on the claim of an express conspiracy even when the plaintiff lacks significant probative evidence of an express agreement, in the present case, as plaintiffs have abandoned their argument of an express agreement and as the pharmacy agreements do vary significantly, the court does not feel so constrained.

Contrary to the plaintiffs' characterization, *Cement Institute* did not involve an inference of conspiracy merely because of a similarity in the structure of a contract. In *Cement Institute*, the 74 corporations belonging to the Cement Institute "always and at all times (for such has been substantially the case . . .) charge[d] for their cement, precisely, to the fractional part of the penny, the price their competitors charged." 333 U.S. at 716, 68 S.Ct. at 810. Moreover, the FTC made detailed findings of collective activities carried on by the Cement Institute, the industry's unincorporated trade association, such as boycotts, discharge of uncooperative employees, organized opposition to erection of new cement plants, etc. Thus, the footnote comment that:

> It is enough to warrant a finding of a combination in violation of the Sherman Act if there is evidence that persons, with knowledge that concerted action was contemplated and invited, give adherence to and participate in a scheme [333 U.S. at 716, n.17, 68 S.Ct. at 811 n.17]

was set in an exceedingly more egregious factual setting and provides no authority for implying a combination here. In the present action there is no evidence that any concerted action was contemplated, much less that defendants participated in some scheme with knowledge of the concerted action.

The second authority—*Catalano Inc. v. Target Sales Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980)—is irrelevant to the case at hand. In *Catalano*, beer wholesalers agreed to fix credit terms. The Supreme Court held that such an agreement could be *per se* illegal even though it merely had an indirect impact on price. *Catalano* did not involve any question of an implication of an illegal conspiracy.

■ Moreover, the general rule in the Ninth Circuit is that proof of analogous business conduct does not support an inference of conspiracy by itself. Such an inference is appropriate only where the actions taken are in apparent contradiction to the party's economic self-interest or where there are circumstances which logically suggest joint agreement, as distinguished from independent action. *Tripper Corp. v. Chrysler Corp.*, 484 F.Supp. 507 (N.D.Cal. 1980); *Independent Iron Works, Inc. v. U. S. Steel Corp.*, 322 F.2d 656, 661 (9th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963). Plaintiffs here do not even attempt to show that it is against the economic self-interest of the insurance companies to maintain such agreements. In the absence of any such evidence, we could not make such a finding. In fact, the Supreme Court in *Royal Drug* assumed the contrary:

> By agreeing with pharmacies on the maximum prices it will pay for drugs, [the insurer] effectively reduces the total amount it must pay to its policyholders. The Agreements thus enable [the insurer] to minimize costs and maximize profits. Such cost-saving arrangements may well be sound business practice . . . .

440 U.S. at 214, 99 S.Ct. at 1074.

■ And perhaps most importantly for purposes of this question, the price terms of all plans differ, even though the structure of the agreements—(deductible, ingredient cost and dispensing fee)—remains the same. Even if the insurance companies did communicate on the question of the structure of the contract, there would be no inference of a conspiracy to fix prices. This argument—that the agreements themselves evidence an unlawful combination—must fail.

2. *Joint agency theory.* Plaintiffs contend that this theory operates in two ways to establish the existence of an unlawful conspiracy. First, plaintiffs allege that defendants Pharmaceutical Card Systems and Paid Prescriptions, as joint agents of the insurance companies, pass on information concerning insurers' dispensing fees to other insurers. This passing of dispensing fee information, plaintiffs contend, constitutes a horizontal conspiracy in violation of the antitrust laws.

In response to this contention, it should first be noted that the only evidence which plaintiffs offer to support this allegation is the deposition testimony of Glenn Spaulding, a former employee of Paid Prescrip-

tions, that he communicated the level of dispensing fees to the Boeing Corporation on one occasion and on another to Blue Cross of Northern California. At the same time, Mr. Spaulding also testified that, to his knowledge, Paid Prescriptions had never advised an insurer as to what the amount of dispensing fee should be, and that Paid Prescriptions had never played any role whatsoever in the determination of the dispensing fee. Thus, unlike the picture plaintiffs attempt to paint, there does not exist a large tangled web of secret passing of price information among the defendants. According to Mr. Spaulding, only on one occasion was price information passed on to a defendant in this action.

■ Second, the mere passing of price information, without more, does not create an inference of a horizontal conspiracy nor does it state a claim for violation of the Sherman Act. *See Kline v. Coldwell, Banker & Co.*, 508 F.2d 226, 232 (9th Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975) (the printing of a price schedule by the Los Angeles Realty Board and its distribution to members, without more, does not establish a horizontal conspiracy in violation of the Sherman Act); *Hanson v. Shell Oil Co.*, 541 F.2d 1352 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977) (supplier may suggest retail price to its dealers and use "persuasion" to get them to adopt such suggested prices, and no antitrust violation can be made out unless plaintiff can show that supplier's conduct rose to the level of coercion).

Third, the case cited by plaintiffs in support of their argument simply cannot be stretched to cover the present factual situation. In *Virginia Excelsior Mills, Inc. v. Federal Trade Commission*, 256 F.2d 538 (4th Cir. 1958), several competing companies formed a new company and expressly agreed that the new company would purchase the competing companies' products, set prices for those products, and allocate market share. Contrary to plaintiffs' characterization, the court in Virginia did not state that the passing of price information constituted a *per se* violation of the antitrust laws; the court did state that:

[T]he obligatory delegation of all discretion in fixing prices to the [newly-formed company] was a violation, per se, of § 1 of the Sherman Act. The primary purpose of the arrangement was to eliminate competition among the producers.

256 F.2d at 540.

■ It is readily apparent that the factual situation in *Virginia* was considerably more onerous than the mere passing of price information to one insurance company defendant by one plan administrator defendant. Thus, even assuming the truth of this allegation, the uncontroverted statements by each defendant that the prices were set independently *plus* the dramatic difference in prices among the plans, counteract any inference of unlawful conspiracy that might arise from Mr. Spaulding's deposition testimony. In addition, this court has no reason to conclude but that the defendants in this action vigorously compete with each other for the business of the member pharmacies and the insureds.

■ The second joint agency theory advanced by plaintiffs is that the insurance companies, insureds and administrators use their collective market power to reduce price competition in the field of retail prescription drugs. Under normal free market conditions, plaintiffs contend, individual insureds would purchase drugs from pharmacists at prevailing market prices. Once a combination of insureds, insurers and administrators occurs, the price of drugs in the free market is driven down and the independent retail pharmacist suffers. It seems that plaintiffs are arguing that any insurance agreement which reimburses pharmacies at anything other than their usual and customary fee violates the antitrust laws. Exactly how this is so remains a mystery to this court. The only case cited by plaintiffs is clearly distinguishable. In *Matter of Atlas Supply Company*, 48 F.T.C. 53 (1951), five oil companies jointly used an agent to purchase auto accessories for their service stations, thereby coercing artificially low prices, as well as kickbacks and rebates

**242**

from sellers. Plaintiffs argue that the two cases are identical: "Here the insurance companies and administrators manipulate the collective buying power of their insureds to coerce pharmacists into selling prescription drugs at prices below their usual and customary prices." However, the facts of the case without further explication, reveal the difference. In *Matter of Atlas* there was a concerted effort to coerce low prices; in the present case, there was no such collaboration.

3. *Conclusion.* It is undisputed that plaintiffs possess no direct evidence of conspiracy. Further, they have been unable to put forth a viable theory which would support their claim of an implied conspiracy. The rule in the Ninth Circuit requires the plaintiff, once the defendant has rebutted the allegations of conspiracy by probative evidence, to come forward with specific factual support of its allegations of conspiracy. *ALW, Inc. v. United Airlines Inc.*, 510 F.2d 52, 55 (9th Cir. 1975). If the plaintiff fails to meet this burden, summary judgment for the defendant becomes proper. To hold otherwise, the Ninth Circuit stated in *Mutual Investors v. Putnam Management Co.*, supra :

> would give free rein to any plaintiff who can draft an antitrust complaint capable of withstanding a motion to dismiss to go to trial with only a wing and a prayer supporting his well drafted complaint.

553 F.2d at 624. After reviewing all arguments and evidence submitted by plaintiffs supporting their claim of horizontal conspiracy, this court concludes that summary judgment is appropriate: plaintiffs' version of the facts does not support a viable legal theory which, if accepted, would entitle them to judgment as a matter of law. *Bushie v. Stenocord Corp.*, 460 F.2d 116, 119 (9th Cir. 1972). We are convinced that plaintiffs have no more than a prayer, much less a wing, to support the allegations in the complaint.

Therefore, it is hereby ORDERED that defendants' motions for summary judgment on the merits be granted.