**VIRGINIA EXCELSIOR MILLS, Inc., a corporation, et al., Petitioners,**

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 7590.

United States Court of Appeals
Fourth Circuit.

Argued April 10, 1958.

Decided June 4, 1958.

Julien J. Mason, Bowling Green, Va., and William H. King, Richmond, Va. (Mason & Stehl, Bowling Green, Va., on brief), for petitioners.

James E. Corkey, Asst. General Counsel (Earl W. Kintner, General Counsel, and Edwin S. Rockefeller, Attorney, Federal Trade Commission, Washington, D. C., on brief), for respondent.

Before SOPER and HAYNSWORTH, Circuit Judges, and THOMSEN, District Judge.

HAYNSWORTH, Circuit Judge.

█ This petition to review an order of the Federal Trade Commission raises the question of whether an agreement among small producers of excelsior, utilized to eliminate competition among themselves, to stabilize prices, to control their own production and productive capacity and to unify their marketing efforts is a violation, *per se*, of § 1 of the Sherman Act. 15 U.S.C.A. § 1.

In 1938, producers of excelsior, a shredded wood product used principally to package fragile materials, were faced with stout competition among themselves and from other packaging materials such as shredded newspapers, corrugated boxes and fillers, and cellophane. The producers in Northern Virginia were small operators. Most of them conducted their businesses as individual proprietorships, but, collectively, their production was approximately 25% of all excelsior sold in the eastern seaboard market. Their production, of course, was substantially less than 25% of the combined sales of excelsior and of competing products in the relevant market. Their aggregate gross sales were little over $1,000,000.00 annually. The competition among themselves was so keen, however, that, by 1938, a majority of the producers of excelsior in Northern Virginia recognized the desirability of eliminating price-cutting practices, of standardizing grades and of improving their credit risks. Accordingly, they organized a new corporation, Virginia Excelsior Mills, Inc., the stock of which was owned by the organizing producers, and the members of its Board of Directors were elected from among their number. Mills then entered into identical contracts with each producer-stockholder by which Mills was appointed the exclusive sales agent of the producer to sell excelsior at such prices as Mills obtained. Orders were to be allocated among the contracting producers upon the basis of their relative productive capacities, and, except for exchanges among the contracting producers, each producer bound himself not to increase his productive capacity. Grades of excelsior were also defined, and the contracts provided that Mills should guarantee all sales credits. Mills was to receive a specified commission for its services.

Apparently, the contracts contemplated that the Board of Directors of Mills should determine the selling price of each grade of excelsior. It is clear that, in practice, it did, and these prices remained unchanged until some of the producers, feeling the pressures of rising costs, prevailed upon the Board of Mills to consider price increases. Upon such occasions, the Board of Mills made in-

quiry into the prices being paid for competing excelsior and other products and increased its own prices when that inquiry indicated that a price increase was feasible. Whatever it did about prices bound all contracting producers.

The initial contracts were for a period of three years. They were successively renewed, in identical form, except as to duration, until 1954, when one producer-stockholder, who was producing "short-fiber" excelsior, objected. All of the other producer-stockholders had signed the renewal contracts, but Mills, because of the one objection, signed none of them. Nevertheless, the parties continued their operations and practices just as they had when the formal contracts were in effect.

■ The complaint in this case was filed against Virginia Excelsior Mills, Inc., and its stockholder-producers under Section 5 of the Federal Trade Commission Act (15 U.S.C.A. § 45) which authorizes the Commission to prevent the use of "unfair methods of competition in commerce * * *." It may be that the authority of the Commission under the Act is not restricted to the prevention of practices which violate other anti-trust laws, but it is clear that any arrangement proscribed by § 1 of the Sherman Act will justify the exercise by the Commission of its preventive powers. Federal Trade Commission v. R. F. Keppel & Bro., Inc., 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814; Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307; Federal Trade Commission v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1009; Fashion Originators' Guild of America, Inc., v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949; Federal Trade Commission v. Pacific States Paper Trade Association, 273 U.S. 52, 47 S.Ct. 255, 71 L.Ed. 534.

Our attention is thus directed to the question of whether this arrangement is in violation of § 1 of the Sherman Act, and the answer seems in little doubt.

Quite apart from those aspects of the arrangement which restricted the production of the individual producer and prohibited expansion of his productive capacity, the obligatory delegation of all discretion in fixing prices to the Board of Directors of Mills was a violation, *per se*, of § 1 of the Sherman Act. The primary purpose of the arrangement was to eliminate competition amongst the producers which had been characterized by price cutting. The intention of the new arrangement was to stabilize prices and that it achieved its purpose is demonstrated by the adherence to the arrangement of the original parties and the subsequent introduction into the combine of other producers. It is emphasized by the fact that their uniform prices were stable thereafter and, uniformly, were increased from time to time, in response to the demands of rising cost rather than in response to the opportunities of growing demand.

■ Price fixing through such an arrangement is a violation, *per se*, of § 1 of the Sherman Act. Though the needs and problems of the producers, which stimulated the creation of the arrangement, may have seemed pressing, they cannot lend a cloak of legality to conduct which, whatever the supposed justification, the Act condemns. United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L.Ed. 1209; Schwegmann Brothers v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701; United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951; United States v. Masonite Corporation, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; Ethyl Gasoline Corporation v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377,

71 L.Ed. 700; Norfolk Southern Bus Corporation v. Virginia Dare Transp. Co., Inc., 4 Cir., 159 F.2d 306; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416. What contrary suggestion may be found in Appalachian Coals, Inc., v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825, has not survived the strong and consistent course of subsequent decision. As was said in United States v. McKesson & Robbins, Inc., supra [351 U.S. 305, 76 S.Ct. 940]:

> "It has been held too often to require elaboration now that price fixing is contrary to the policy of competition underlying the Sherman Act and that its illegality does not depend on a showing of its unreasonableness, since it is conclusively presumed to be unreasonable. It makes no difference whether the motives of the participants are good or evil; whether the price fixing is accomplished by express contract or by some more subtle means; whether the participants possess market control; whether the amount of interstate commerce affected is large or small; or whether the effect of the agreement is to raise or to decrease prices."

The petitioners also complain of the scope of the order.

■ First, it is said that the requirement that each producer desist from entering into any agreement with others, not parties to the proceeding, to fix the selling price of excelsior, would prevent the individual producer from making sales to purchasers. Every sale is, of course, an agreement, and it necessarily "fixes" the price of the articles sold, but the order is not to be construed with such literality as to produce a preposterous result. The Commission was solely concerned with agreements and understandings between producers, and the term "to fix the selling price of excelsior" must be construed against that background. Obviously, it was not intended to prevent an individual producer, acting independently of other producers, from selling his product. The term, "agreements to fix selling prices," as used in the field of anti-trust law, necessarily encompasses the notion of concerted action by two, or more, vendors. We give the order a reasonable construction consistent with its evident purpose.

■ Next it is contended that the order goes too far in its prohibition of the operation or maintenance by the petitioning producers of Virginia Excelsior Mills, Inc., or "any other corporation or organization as a common selling agent." Doubtless, this requirement found expression in the order because of the insistent contention of the producers that they had never done more than maintain a common selling agent, conduct which, without more, has not been held unlawful under the Sherman Act. Evidently, and appropriately, the Commission wished to make it clear that, however the concerted action of the producers was characterized, it should not continue. However, in some businesses, it is common practice for several producers to utilize the services of one sales agency, and there is nothing unlawful in such an arrangement when each producer reserves, and exercises, independence in pricing, acceptance of orders, production and other material matters. That there may be no misunderstanding of the scope of the order, in this respect, it is appropriate that we limit the prohibition against the maintenance of a common selling agent to its utilization in aid of a purpose which could not be lawfully accomplished under the order by a direct agreement among the participating producers.

As so modified, the order of the Commission is affirmed and enforced.

Modified and affirmed.