STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NO. 2020 CA 0162

JOHN RIVER CARTAGE, INC.

VERSUS

LOUISIANA GENERATING, LLC; NRG ENERGY, INC.; AND HEADWATERS
RESOURCES, INC.

*Judgment Rendered:*  MAR 0 4 2020

* * * * * * * *

Appealed from the
Eighteenth Judicial District Court
In and for the Parish of Pointe Coupee
State of Louisiana
Case No. 44406

Honorable Alvin Batiste, Jr., Judge Presiding

* * * * * * * *

| | |
|---|---|
| Jason L. Melancon<br>Robert C. Rimes<br>R. Lee Daquanno, Jr.<br>Baton Rouge, Louisiana<br>and<br>Frank Tomeny, III<br>Baton Rouge, Louisiana | Counsel for Plaintiff/Appellant,<br>John River Cartage, Inc. |
| Jeffrey N. Boudreaux<br>William L. Caughman, III<br>Jessica C. Engler<br>Baton Rouge, Louisiana | Counsel for Defendants/Appellants,<br>Louisiana Generating, LLC and NRG<br>Energy, Inc. |
| Richard F. Zimmerman, Jr.<br>Baton Rouge, Louisiana<br>and<br>Andrew J. Tuck, Pro Hac Vice<br>Lee A. Deneen, Pro Hac Vice<br>Atlanta, Georgia<br>and<br>R. Bryan Barnes, Pro Hac Vice<br>Columbia, South Carolina<br>and | Counsel for Defendant/Appellant,<br>Headwaters Resources, Inc. |

Keith L. Richardson
Baton Rouge, Louisiana

\* \* \* \* \* \* \* \*


BEFORE: McDONALD, THERIOT, AND CHUTZ, JJ.

2

**CHUTZ, J.**

In this antitrust litigation, all parties appeal the trial court's judgment, which granted defendants' motions for partial summary judgment on the issue of plaintiff's *per se* antitrust claims under La. R.S. 51:122 and dismissed those claims with prejudice, denied defendants' motions for partial summary judgment as to plaintiff's antitrust monopoly claim under La. R.S. 51:123 and plaintiff's conversion claims, and denied plaintiff's motion for partial summary judgment on the issues of the antitrust mode of analysis and joint venture. For the following reasons, we affirm.

## FACTUAL BACKGROUND

In Louisiana, there are three primary power companies operating coal-burning power plants: Entergy Gulf States, Inc. (Entergy), which operates the Nelson Power Station in Westlake, Louisiana; Cleco Power, LLC (Cleco), which owns and operates the Rodemacher Power Station near Boyce, Louisiana, Dolet Hills Power Station near Mansfield, Louisiana, and the Madison 3 Unit in Lena, Louisiana; and Louisiana Generating, LLC (LaGen), a subsidiary of NRG Energy, Inc. (NRG) and the majority owner and operator of the Big Cajun II fossil fuel steam-generating plant in New Roads, Louisiana.

As a result of burning coal, these plants produce byproducts called coal combustion products (CCPs). These CCPs include fly ash, bottom ash, and economizer ash. These CCPs are marketable for different uses depending on their characteristics. C-618 fly ash, a powdered fly ash that has never been hydrated, can be used in the concrete industry as a replacement for cement. When fly ash is exposed to water (hydrated), it hardens, and the resulting hydrated fly ash can be used as an aggregate in applications such as soil stabilization and the formation of roadbeds.

3

The Nelson, Rodemacher, and Dolet Hills Power Stations and Big Cajun II produce C-618 fly ash. The Madison 3 Unit, which is a circulating fluidized bed (CFB) plant, produces a different type of ash other than that used in the concrete industry.

The normal coal-burning process used to generate electricity requires that CCPs be removed as they accumulate. Thus, coal-burning plants will contract with third parties for the removal and marketing, or, if not sold, the storage, of the CCPs they produce. As such, Entergy, Cleco, and LaGen have entered into marketing agreements for the removal, marketing, sale, and storage if necessary of CCPs on their plant sites.

With regard to Big Cajun II, Big River Industries, Inc. (Big River) held an exclusive marketing agreement for the removal, marketing, sale, and, if not sold, storage of CCPs produced at Big Cajun II for many years when Big Cajun II was owned and operated by Cajun Electric Power Cooperative, Inc. (Cajun Electric). Similarly, after LaGen became the owner and operator of Big Cajun II in 2000, LaGen entered into an Exclusive Marketing Agreement with Big River.

The agreement between LaGen and Big River was amended several times over the years. The last contract executed between LaGen and Big River, a January 29, 2009 Exclusive Marketing Agreement, provided that Big River was granted the "total responsibility for identification of uses, promotion, sales and delivery of Fly Ash, Bottom Ash, and other CCPs" produced at Big Cajun II (the LaGen/Big River Agreement). Moreover, Big River was also responsible for transporting all non-marketed CCPs from the area where they were temporarily placed by LaGen to LaGen's onsite ash storage pond and to manage those stockpiled CCPs. Big River was compensated based on a contractually established percentage of gross sales less transportation costs for the various forms of CCPs, with Big River guaranteeing the sale of a certain quantity of CCPs each year. Pursuant to the

4

LaGen/Big River Agreement, Big River was required to make a guaranteed per-ton payment for any shortfall in the guaranteed sales quantities of CCPs.

Meanwhile, at the time when Big Cajun II was still owned and operated by Cajun Electric, Big River began to experience a problem with an overabundance of hydrated ash on the Big Cajun II premises. Thus, on August 1, 1998, Big River entered into an agreement, the term of which was extended over the years, with plaintiff, John River Cartage, Inc. (JRC) to address the excess ash not sold to the outside market (the JRC/Big River Agreement).

Pursuant to the JRC/Big River Agreement, JRC agreed to purchase and to remove a specified minimum tonnage of hydrated fly ash and bottom ash at a price set forth therein. JRC was responsible for all costs associated with the recovery, loading, processing, and transportation of the hydrated fly ash and bottom ash from the ash disposal ponds onsite. JRC also agreed to purchase excess powdered fly ash at a higher set price.

The JRC/Big River Agreement further acknowledged that Big River held the exclusive marketing agreement for the marketing and sale of all fly ash and bottom ash produced from the Big Cajun II operations and that the JRC/Big River Agreement was made "expressly subject to the terms and conditions" of the LaGen/Big River Agreement. Further, JRC acknowledged that the LaGen/Big River Agreement could be amended "without prior notice or the consent of" JRC.

As a result of the JRC/Big River Agreement, JRC set up equipment on the Big Cajun II plant site and began the removal of the hydrated fly ash and bottom ash, which it processed into its product called "Grey Stone." Grey Stone is an aggregate material, manufactured with fly ash, black bottom ash, brown bottom ash, and water, which JRC marketed and sold for use in roadbeds and erosion control projects. As JRC produced its Grey Stone product, it stockpiled the product on the Big Cajun II site until such time that the material was sold and

5

transported off the premises. Pursuant to the JRC/Big River Agreement, JRC made payment of the contractual sum for the CCPs utilized when the product left the Big Cajun II premises. JRC also on occasion sold excess powdered fly ash within the state of Louisiana, but could do so only with Big River's express permission.

On January 20, 2011, LaGen entered into an Exclusive Marketing Agreement with Headwaters Resources, Inc. (HRI) for the marketing, sale, and delivery of CCPs produced at Big Cajun II (the LaGen/HRI Agreement). LaGen and Big River then agreed that the LaGen/Big River Agreement terminated effective January 21, 2011, and LaGen gave Big River thirty days from that date to remove its property and equipment from the site.

Big River then notified JRC that Big River had lost its contract with LaGen and, thus, JRC needed to remove all of its equipment from the Big Cajun II site. JRC removed its equipment but was not able to remove the stockpiled Grey Stone.

At the time LaGen awarded HRI the LaGen/HRI Agreement for Big Cajun II in 2011, HRI also held exclusive marketing agreements with Entergy for the Nelson Power Station and with Cleco for the Rodemacher and Dolet Hills Power Stations, and the Madison 3 Unit. Thus, HRI was the exclusive marketing agent of all sources of C-618 fly ash produced in Louisiana from 2011 until 2014.[1] Once HRI took over the exclusive marketing agreement for Big Cajun II in 2011, there was an initiative by HRI to increase fly ash prices previously paid by former Big River customers to a level HRI considered to be the "competitive price."

Following the termination of the LaGen/Big River Agreement and the resulting termination of the JRC/Big River Agreement, JRC could not sustain its business and eventually ceased all business operations.

---

[1] In 2014, HRI's competitor, Charah, became the exclusive marketing agent for the Rodemacher Power Station and Madison 3 Unit.

## PROCEDURAL HISTORY

On January 26, 2012, JRC filed a petition seeking damages from HRI and NRG and LaGen (hereinafter collectively referred to as NRG/LaGen).[2] JRC filed several amending petitions, ultimately filing a First Amended Master Petition for Damages, wherein JRC sought compensatory and treble damages from HRI and NRG/LaGen due to their alleged: (1) wrongful conversion and conspiracy to commit conversion of JRC's stockpiled inventory of Grey Stone; (2) violations of the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), La. R.S. 51:1401, et seq.; and (3) violations of Louisiana's antitrust law, including a conspiracy to restrain trade by fixing prices of C-618 fly ash marketed in Louisiana in violation of La. R.S. 51:122, and a conspiracy to monopolize the C-618 fly ash market in Louisiana in violation of La. R.S. 51:123.[3]

With regard to its antitrust claims, JRC alleged that HRI and Cleco, Entergy, and NRG/LaGen had entered into a horizontal conspiracy in restraint of trade. First, it alleged that HRI, as the common and exclusive marketing agent for Cleco, Entergy, and NRG/LaGen, operated a hub-and-spoke conspiracy on behalf of these power companies by setting uniform prices, taking orders, and allocating customers and production territory for coal ash they produced. Additionally, JRC averred that Cleco, Entergy, and NRG/LaGen knew or should have known that HRI was simultaneously representing their collective competitive business interests from 2011 through 2014. Thus, JRC alleged that a *per se* illegal

---

[2]JRC referred to NRG and LaGen collectively in its First Amended Master Petition, and NRG and LaGen together filed pleadings below and in this appeal.

[3]In previous petitions, JRC had contended that HRI and NRG/LaGen had attempted to restrain trade and monopolize "the CCP market" or the market for "CCPs and related products." However, in its First Amended Master Petition for Damages, it more narrowly contended that these defendants had engaged in antitrust violations with regard to "Louisiana's C-618 fly ash industry."

horizontal price-fixing agreement could be inferred from the parallel behavior of these various entities.[4]

Alternatively, JRC alleged that HRI and NRG/LaGen entered into a vertical price-fixing conspiracy when they executed the LaGen/HRI Agreement. With regard to this alleged conspiracy, JRC alternatively alleged that this vertical price-fixing conspiracy was subject to the *per se* mode of analysis, the "quick look" approach, or the full rule-of-reason analysis.

With regard to its monopoly claims, JRC averred that HRI and NRG officials conspired to create the monopoly that HRI ultimately exerted following the LaGen/HRI Agreement and that they conspired to monopolize and did monopolize the C-618 fly ash market in violation of La. R.S. 51:123.

JRC further alleged that HRI and NRG/LaGen were solidarily liable for JRC's damages resulting from their concerted and collective actions, which constituted intentional and willful acts.

JRC filed a motion for partial summary judgment on the issues of *per se* antitrust mode of analysis and joint venture, seeking a declaration that: (1) HRI had entered into joint venture agreements with Cleco, Entergy, and NRG/LaGen; and/or (2) the *per se* antitrust mode of analysis was applicable to this matter.[5]

---

[4]As noted by the trial court in its written reasons for judgment, neither Cleco nor Entergy are parties to this litigation.

[5]JRC's motion for partial summary judgment was actually filed prior to the filing of its First Amended Master Petition for Damages. The motion was scheduled for hearing together with exceptions of no cause of action filed by HRI and NRG/LaGen with regard to JRC's previous "Master Petition for Damages." Following that hearing, the trial court sustained the exceptions of no cause of action related to all of JRC's antitrust claims under La. R.S. 51:122 and 51:123, dismissing those claims without prejudice, subject to JRC's right to amend within thirty days. Accordingly, it also denied as moot JRC's motion for partial summary judgment. JRC then filed its First Amended Master Petition for Damages, and HRI and NRG/LaGen again filed exceptions of no cause of action.

However, on appeal of the trial court's subsequent judgment sustaining those exceptions of no cause of action and dismissing JRC's antitrust claims with prejudice, this court reversed the judgment sustaining the exceptions of no cause of action and also vacated the earlier judgment denying JRC's motion for partial summary judgment as moot. In doing so, this court noted that because the trial court's rulings with respect to the exceptions of no cause of action had been reversed, JRC's motion for partial summary judgment on the issues of *per se* antitrust mode of analysis and joint venture was "ripe for judicial determination." Thus, this court remanded the matter with instructions that the trial court "consider and rule on JRC's motion for partial

Defendant HRI also filed a motion for partial summary judgment, seeking dismissal of JRC's antitrust claims under both La. R.S. 51:122 and 51:123.[6] In support of its motion, HRI contended that it was entitled to dismissal of JRC's antitrust claims against it as follows: (1) JRC could not establish antitrust injury because its alleged injuries did not flow from the claimed anticompetitive conduct; (2) HRI's alleged conduct was subject to the rule of reason because JRC has identified nothing more than a series of vertical agreements; and (3) JRC's rule of reason and monopoly claims fail because the market alleged by JRC—the 50-mile radius extending from Big Cajun II—was not the relevant market.

Likewise, NRG/LaGen filed a motion for partial summary judgment, seeking dismissal of JRC's antitrust claims, averring that those claims should be dismissed because: (1) JRC had not suffered an antitrust injury; and (2) even if JRC could establish an antitrust injury, it had not alleged and could not prove a horizontal conspiracy between NRG, LaGen, and HRI or any agreement among those parties to restrain trade.[7]

Following a hearing on the motions, the trial court, by judgment dated December 4, 2019, denied JRC's motion for partial summary judgment; granted in part HRI's and NRG/LaGen's motions for summary judgment as to JRC's *per se* antitrust claims under La. R.S. 51:122; and denied in part those motions as to

---

summary judgment." ***John River Cartage, Inc. v. Louisiana Generating, LLC***, 2018-1611 (La. App. 1st Cir. 12/19/18), 2018 WL 6629472 *6 (unpublished), writs denied, 2019-0122, 2019-0111 (La. 4/15/19), 267 So. 3d 1122, 1129.

On remand, JRC moved to reset its motion for partial summary judgment.

[6]Defendants HRI and NRG/LaGen also filed motions for partial summary judgment, seeking dismissal of JRC's conversion and conspiracy to commit conversion claims, contending that JRC could not establish that it owned the Grey Stone product it accused them of converting.

[7]In its memorandum in support of its motion, NRG/LaGen further stated that it joined in HRI's motion for partial summary judgment as to JRC's antitrust claims and adopted HRI's arguments.

JRC's monopoly claim under La. R.S. 51:123.[8]

JRC appealed the trial court's December 4, 2019 judgment, challenging, through six assignments of error, those portions of the judgment denying its motion for partial summary judgment and granting HRI's and NRG/LaGen's motions for partial summary judgment as to JRC's *per se* antitrust claims, dismissing those claims with prejudice.[9] HRI and NRG/LaGen also appealed the trial court's December 4, 2019 judgment, each contending through two assignments of error that the trial court erred in denying their motions for partial summary judgment as to JRC's monopoly claims.

## LEGAL PRECEPTS

### Summary Judgment

A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. A summary judgment is reviewed on appeal *de novo*, with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate; i.e., whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. *Beer Indus. League of Louisiana v. City of New Orleans*, 2018-0280 (La. 6/27/18), 251 So. 3d 380, 385-86.

The burden of proof rests with the mover. La. C.C.P. art. 966(D)(1). When the mover will bear the burden of proof at trial, the mover has the burden of showing that no genuine issue of material fact remains. Only when the mover makes this showing does the burden shift to the opposing party to present evidence

---

[8]As to HRI's and NRG/LaGen's motions for partial summary judgment seeking dismissal of JRC's conversion claims, in its written reasons, the trial court found that genuine issues of material fact remained as to those claims. Accordingly, in its December 4, 2019 judgment, the trial court also denied those motions. Neither HRI nor NRG/LaGen has appealed that portion of the judgment, and, thus, the conversion claims are not before us.

[9]As set forth in La. R.S. 51:135, all interlocutory judgments in cases involving antitrust claims shall be appealable within five days and shall be heard and determined within twenty days after the appeal is lodged.

demonstrating a material factual issue remains. *Action Oilfield Services, Inc. v. Energy Management Company*, 2018-1146 (La. App. 1st Cir. 4/17/19), 276 So. 3d 538, 541-542. If, however, the mover does not resolve all material issues of fact, the burden never shifts to the opposing party. In that situation, the opposing party has nothing to prove in response to the motion for summary judgment, and summary judgment should be denied. See *Hat's Equipment, Inc. v. WHM, L.L.C.*, 2011-1982 (La. App. 1st Cir. 5/4/12), 92 So. 3d 1072, 1076.

Nevertheless, if the mover will not bear the burden of proof at trial on the issue raised in the motion, the mover's burden on the motion does not require it to negate all essential elements of the adverse party's claim, action, or defense, but rather to point out to the court the absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, the burden is on the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law. La. C.C.P. art. 966(D)(1). Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can only be seen in light of the substantive law applicable to the case. *Pumphrey v. Harris*, 2012-0405 (La. App. 1st Cir. 11/2/12), 111 So. 3d 86, 89.

## Conspiracy in Restraint of Trade Pursuant to La. R.S. 51:122

Louisiana Revised Statutes 51:122(A) provides, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal." This statute is virtually identical to Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, et seq., and federal analysis of the Sherman Antitrust Act is persuasive, though not controlling.[10] *HPC Biologicals,*

---

[10]The Louisiana statute applies to intrastate commerce, whereas the Sherman Antitrust Act applies to interstate commerce and foreign trade. See La. R.S. 51:121, La. R.S. 51:122, & 15 U.S.C. § 1.

11

*Inc. v. UnitedHealthcare of Louisiana, Inc.*, 2016-0585 (La. App. 1ˢᵗ Cir. 5/26/16), 194 So. 3d 784, 792-93.

The federal and state antitrust laws were intended to be sweeping in breadth, encompassing every conspiracy, contract, or combination that restrains trade. *Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 493 So. 2d 1149, 1154-55 & n.12 (La. 1986). Not every business arrangement that restrains trade in some manner is illegal, however. Rather, La. R.S. 51:122 has been interpreted to prohibit only those agreements or conspiracies that unreasonably restrain trade. See *Reppond v. City of Denham Springs*, 572 So. 2d 224, 230 (La. App. 1ˢᵗ Cir. 1990), and *Clary v. State Farm Mutual Automobile Ins. Co.*, 2016-168 (La. App. 3ʳᵈ Cir. 11/23/16), 204 So. 3d 1102, 1113, writs denied, 2017-0209, 2017-0197 (La. 2/15/17), 215 So. 3d 702, 703. Thus, to establish an antitrust violation, a plaintiff must show both the existence of a conspiracy to restrain trade *and* that the intended restraint on trade is unreasonable. See *Nafrawi v. Hendrick Medical Center*, 676 F. Supp. 770, 774 (N.D. Tex. 1987).

As to the existence of an agreement to restrain trade, the plain language of La. R.S. 51:122 requires a plurality of actors. A "contract," a "combination," and a "conspiracy" each suggests the participation of more than one person or entity. *Louisiana Power & Light Co.*, 493 So. 2d at 1155. In determining whether the restraint of trade is unreasonable, three methods or modes of analysis have been developed for evaluating the reasonableness of a restraint on trade: the rule-of-reason analysis, the *per se* analysis, and the "quick look" analysis. *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 772 (8ᵗʰ Cir. 2004).

The rule-of-reason analysis, which is used to analyze the reasonableness of most trade-restraining agreements, requires the factfinder to determine whether the questioned practice imposes an unreasonable restraint on competition by considering a variety of factors, including specific information about the relevant

business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect. *State Oil Co. v. Khan*, 522 U.S. 3, 10, 118 S. Ct. 275, 279, 139 L. Ed. 2d 199 (1997).

Unlike the rule-of-reason analysis, the *per se* analysis does not allow inquiry into the intent behind the restraint, its procompetitive justifications, or its actual effect on competition. Instead, where a restraint is deemed *per se* unreasonable, a conclusive presumption of illegality applies.[11] *Craftsmen Limousine, Inc.*, 363 F.3d at 773.

As a general rule, horizontal agreements, those involving coordination between competitors at the same level of a market structure, are considered to be *per se* unreasonable, whereas vertical agreements, created between parties at different levels of a market structure, are analyzed under the rule-of-reason analysis. *Van Hoose v. Gravois*, 2011-0976 (La. App. 1st Cir. 7/7/11), 70 So. 3d 1017, 1022.

### Monopoly Pursuant to La. R.S. 51:123

Louisiana Revised Statutes 51:123 provides, in part, that "[n]o person shall monopolize, or attempt to monopolize, or combine, or conspire with any other person to monopolize any part of the trade or commerce within this state." As an economic matter, monopoly power exists where prices can be raised above the levels that would be charged in a competitive market. To establish a claim for monopoly, a plaintiff must establish that: (1) the defendant possessed monopoly

---

[11]A third method of analyzing whether a conspiracy is unreasonable is the abbreviated "quick look" analysis under the rule of reason, which is applied when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *California Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 770, 119 S. Ct. 1604, 1612, 143 L. Ed. 2d 935 (1999). The quick-look approach does not require an elaborate industry analysis. Rather, when the restraint is not *per se* unreasonable, but the likelihood of anticompetitive effects is obvious, the proponent of the restraint must show some competitive justification for it. Thus, once the restraint is deemed facially anticompetitive, the burden shifts to its proponent for justification on procompetitive grounds. *Realcomp II, Ltd. v. Fed. Trade Comm'n*, 635 F.3d 815, 825 (6th Cir.), cert. denied, 565 U.S. 942, 132 S. Ct. 400, 181 L. Ed. 2d 257 (2011).

power in a clearly defined economic and geographic region (the relevant market); and (2) the defendant had the specific purpose or intent to exercise or maintain that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Plaquemine Marine, Inc. v. Mercury Marine*, 2003-1036 (La. App. 1st Cir. 7/25/03), 859 So. 2d 110, 119-20.

Monopoly power is defined as the ability to control prices or to exclude competition from the market, and the relevant market is the area of effective competition within which the defendant operates. *Id.* It includes a geographic market, which is the section of the country in which sellers of a particular product operate, as well as a product market, which encompasses the differences among various commodities and the willingness of buyers to substitute one product for another. Failure to define the market in which the monopoly is allegedly exercised is fatal to a monopolization claim. *Id.* at 120.

## DISCUSSION

From a review of the pleadings and memoranda filed herein, JRC's basic theories of antitrust violations can be summarized as follows. HRI, operating at the marketing and sales level of the Louisiana CCPs market, facilitated a scheme among Cleco, Entergy, and NRG/LaGen, competing producers of CCPs at the production level of the Louisiana CCPs market, to restrain trade within that market. This scheme was accomplished by first eliminating competition in the Louisiana CCPs market by replacing Big River, NRG/LaGen's prior exclusive marketing agent, with HRI, which already operated as the exclusive marketing agency for Cleco and Entergy. Thereafter, HRI, operating as the common and exclusive sales agency for all three of these competing power companies, refused to deal with JRC by refusing to sell hydrated fly ash or excess powdered fly ash to JRC, thereby preventing JRC from continuing its production and sale of Grey

14

Stone in the secondary CCPs market. With Big River and JRC effectively removed from the Louisiana CCPs market, HRI, as the common and exclusive sales agency for Cleco, Entergy, and NRG/LaGen, and representing their collective business interests, stabilized Louisiana's CCPs market by imposing uniform price increases and controlling output.

JRC contends that this alleged conspiracy among HRI, Cleco, Entergy, and NRG/LaGen constitutes a horizontal restraint on trade that, under the *per se* antitrust mode of analysis, is deemed *per se* unreasonable in violation of La. R.S. 51:122. Alternatively, JRC alleges that the conspiracy in restraint of trade was a vertical price-fixing conspiracy between HRI and NRG/LaGen. Finally, JRC alleges that these actions constituted a conspiracy to monopolize in violation of La. R.S. 51:123.

The various motions for partial summary judgment addressed in the trial court's December 4, 2019 judgment focus on different aspects of these claims.

### Denial of JRC's Motion for Partial Summary Judgment on the Issues of *Per Se* Antitrust Mode of Analysis and Joint Venture (JRC's Assignments of Error Nos. 1 and 6)

While JRC alternatively alleged in its First Amended Master Petition for Damages both a horizontal conspiracy and a vertical conspiracy in restraint of trade, in its motion for partial summary judgment, JRC focused on the horizontal conspiracy, seeking judgment declaring: (1) that HRI had entered into joint venture agreements with Cleco, Entergy, and NRG/LaGen; and/or (2) that, given the law affecting joint venture, common and exclusive sales agency, or hub-and-spoke conspiracies, the *per se* antitrust mode of analysis was applicable to this matter.

In support of its motion, JRC alleged that when HRI entered into exclusive marketing agreements with Cleco, Entergy, and NRG/LaGen, HRI entered into separate joint ventures for the sales of CCPs with each of these power companies. Additionally, it contended that the *per se* antitrust analysis applied to the alleged

conspiracy herein under three alternative theories: (1) HRI, as a common member of separate horizontally competing joint ventures with NRG/LaGen, Entergy, and Cleco, engaged in prohibited antitrust violations by fixing prices, allocating market territory, and refusing to deal with JRC on behalf of the three horizontal joint ventures; or (2) NRG/LaGen, Entergy, and Cleco delegated pricing, ordering, and production/market allocation to HRI as their common and exclusive sales agency, with the known and express purpose of fixing and stabilizing CCP commodity prices; or (3) HRI and NRG/LaGen, Entergy, and Cleco entered into a hub-and-spoke conspiracy by use of a common sales agency to carry out the unlawful scheme of fixing and stabilizing CCPs prices. JRC further averred that each of the three alternatively alleged arrangements between HRI and the power companies resulted in a horizontal restraint of trade, thus requiring application of the *per se* antitrust mode of analysis.

In denying JRC's motion, the trial court concluded in written reasons for judgment that JRC had failed to submit any factual support of a joint venture between HRI and Cleco, Entergy, or NRG/LaGen or of a horizontal conspiracy to restrain trade among these various entities. Thus, the court further reasoned that because JRC had failed to set forth facts to establish the existence of a conspiracy, there was no need to address the various theories alleged by JRC as requiring application of the *per se* antitrust mode of analysis.

On appeal, JRC contends in its sixth assignment of error that the trial court legally erred when it "defied" this court's instruction in the prior appeal in *John River Cartage, Inc. v. Louisiana Generating, LLC*, 2018-1611 (La. App. 1st Cir. 12/19/18), 2018 WL 6629472 at *6 (unpublished), writs denied, 2019-0122, 2019-0111 (La. 4/15/19), 267 So. 3d 1122, 1129, "by refusing to categorize the unlawful common selling agency alleged herein as a jurisprudentially recognized form of *per se* illegal horizontal agreement." However, as set forth in footnote 5 above, in

16

the prior appeal in this matter, this court, having reversed and vacated the trial court's rulings on defendants' exceptions of no cause of action, noted that JRC's motion for partial summary judgment, which the trial court had denied as moot, was "ripe for judicial determination." Thus, this court remanded the matter for the trial court to "consider and rule on JRC's motion for partial summary judgment," *John River Cartage, Inc.*, 2018 WL 6629472 at *6, which is precisely what the trial court did when it denied JRC's motion, finding that JRC had not proved its entitlement to summary judgment in its favor. Thus, we reject JRC's contention that the trial court defied any prior instruction in our prior decision.

Moreover, in light of our conclusion, as more fully discussed below, that the trial court properly dismissed JRC's *per se* antitrust claims on HRI's and NRG/LaGen's motions for partial summary judgment, we find it unnecessary to address JRC's contention in assignment of error number one that the trial court erred in failing to categorize the alleged unlawful common selling agency as a *per se* illegal horizontal agreement. Accordingly, we decline to address this issue and affirm the portion of the trial court's December 4, 2019 judgment denying JRC's motion for partial summary judgment.

### Trial Court's Partial Grant of HRI's and NRG/LaGen's Motions for Partial Summary Judgment and Resulting Dismissal of JRC's *Per Se* Antitrust Claims under La. R.S. 51:122
### (JRC's Assignments of Error Nos. 2, 3, 4 & 5)

Next we turn to JRC's challenge to the portion of the trial court's judgment granting in part HRI's and La/Gen's motions for partial summary judgment and dismissing JRC's *per se* antitrust claims. At the outset, we address JRC's contention that the trial court erred in deciding the issue of conspiracy on partial summary judgment where JRC had not been given a fair opportunity for discovery on this issue. The requirement in La. C.C.P. art. 966(A)(3) that a summary judgment should be considered only after "an opportunity for adequate discovery"

has been construed to mean that there is no absolute right to delay action on a motion for summary judgment until discovery is complete; rather, the requirement is only that the parties have a fair opportunity to carry out discovery and to present their claim. *Primeaux v. Best Western Plus Houma Inn*, 2018-0841 (La. App. 1st Cir. 2/28/19), 274 So. 3d 20, 32. Additionally, trial courts in Louisiana have broad discretion when regulating pre-trial discovery, which discretion will not be disturbed on appeal absent a clear showing of abuse. *Id.*

We note that JRC's action has been pending since January of 2012. As early as September of 2015, JRC amended its petition to assert antitrust violations involving an alleged conspiracy in restraint of trade, again amending its petition in August of 2017, to allege that the horizontal conspiracy involved HRI, Cleco, Entergy, and NRG/LaGen. Moreover, HRI first sought dismissal of these antitrust claims in a motion for summary judgment it filed in February of 2017, thus affording JRC ample notice that this issue would be before the trial court. Accordingly, we find no clear abuse of the trial court's discretion in declining to delay ruling on this issue.

Turning to the merits of this claim, to satisfy the elements of conspiracy, a plaintiff must show that the defendants engaged in concerted action, meaning a conscious commitment to a common scheme designed to achieve an unlawful objective. See *HPC Biologicals, Inc.*, 194 So. 3d at 793. Moreover, to establish a *per se* unreasonable horizontal conspiracy, a plaintiff must establish that the conspiracy involved coordination between competitors at the same level of a market structure. See *Van Hoose*, 70 So. 3d at 1022. Independent parallel conduct, or even conduct among competitors that is consciously parallel, does not alone establish the contract, combination, or conspiracy. *Camsoft Data Systems, Inc. v. Southern Electronics Supply, Inc.*, 2018-1609 (La. App. 1st Cir. 12/3/18),

276 So. 3d 1053, 1059, writs denied, 2018-02088, 2018-02018 (La. 2/11/19), 263 So. 3d 1151, 1153.

Because JRC would have the burden of proof at trial to establish the existence of a horizontal conspiracy, HRI and NRG/LaGen only had to point to the absence of factual support for one element of that claim. In support of their motions, they asserted in part that there was an absence of factual support for an essential element of a *per se* antitrust violation under any of the theories JRC alleged, because there is no evidence of the existence of any agreement or conspiracy among Cleco, Entergy, and NRG/LaGen. We find that HRI and NRG/LaGen met that initial burden.

Thus, once HRI and NRG/LaGen successfully pointed to the lack of evidence of Cleco or Entergy engaging in any concerted actions with NRG/LaGen in furtherance of an alleged horizontal scheme in restraint of trade or of any knowledge or acquiescence by Cleco or Entergy to such a scheme, the burden shifted to JRC. JRC then had to produce factual support sufficient to establish the existence of a genuine issue of material fact as to a horizontal conspiracy in restraint of trade or that HRI and NRG/LaGen were not entitled to judgment as a matter of law. La. C.C.P. art. 966(D)(1).

On appeal, JRC contends in its second and fifth assignments of error that it did produce factual support to establish the existence of genuine issues of material fact regarding: (1) an unlawful horizontal conspiracy among the power companies through either: (a) direct evidence of an unlawful common sales agency conspiracy, or (b) circumstantial evidence of a hub-and-spoke conspiracy coordinated by their common sales agency; or (2) a horizontal conspiracy by virtue

of a joint venture between HRI and Entergy and between HRI and Cleco, respectively.[12]

## A. Joint Venture

Addressing JRC's joint venture claim first, JRC avers that the trial court erred in dismissing its *per se* antitrust claims where it demonstrated the existence of genuine issues of material fact as to the existence of joint ventures between HRI and Cleco, HRI and Entergy, and HRI and NRG/LaGen. Under this theory, JRC posits that because HRI was a common member of individual joint-venture partnerships with Cleco and Entergy, HRI's actions in inviting NRG/LaGen to join in a price-fixing and market-territory-allocation scheme were taken in the capacity of a pure, non-vertical, direct competitor, thus constituting horizontal action in restraint of trade.

A joint venture has been defined as a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation. *Coffee Bay Investors, L.L.C. v. W.O.G.C. Company*, 2003-0406 (La. App. 1st Cir. 4/2/04), 878 So. 2d 665, 670, writ denied, 2004-1084 (La. 6/25/04), 876 So. 2d 838. Generally, the essential elements of a joint venture are the same as those of partnership, i.e., two or more parties combining their property, labor, skill, etc. in the conduct of a venture for joint profit, with each having some right of control. *Cajun Electric Power Cooperative, Inc. v. McNamara*, 452 So. 2d 212, 215 (La. App. 1st Cir.), writ denied, 458 So. 2d 123 (La. 1984). Thus, joint ventures are governed by the law of partnership and share the same requisites as follows: (1) a contract between two or more persons; (2) the establishment of a juridical entity or person; (3) contribution

---

[12]We note that JRC contends in its fourth assignment of error that the trial court erred in concluding in its reasons for judgment that JRC could not establish a horizontal agreement absent first establishing a joint venture. Because this court reviews summary judgments *de novo*, we afford no deference to the trial court's underlying reasoning for its judgment. *King v. Allen Court Apartments*, 2015-0858 (La. App. 1st Cir. 12/23/15), 185 So. 3d 835, 839, writ denied, 2016-0148 (La. 3/14/16), 189 So. 3d 1069. Accordingly, we need not address this argument.

by all parties of either efforts or resources; (4) contribution in determinate proportions; (5) joint effort; (6) mutual risk vis-à-vis losses; and (7) a sharing of profits. *Cajun Electric Power Cooperative, Inc.*, 452 So. 2d at 215.

Based on our *de novo* review of the evidence, we conclude that JRC has failed to demonstrate a genuine issue of material fact as to several of these elements. Regarding joint effort, the power companies produce energy, and CCPs are merely a byproduct of that energy production. Because the accumulation of these CCPs can impede the energy-production process, these power companies contracted with HRI to manage these byproducts by transporting them out of the production and surrounding areas either for marketing and sale or alternatively for relocation to designated sites on the various plant premises. HRI alone was responsible for the efforts in transporting the CCPs from the production areas for sale or placement in other designated areas.

With regard to the element of the sharing of profits, while JRC contends that Entergy and Cleco shared "net profits" with HRI, a review of the marketing agreements of record does not support that contention. Rather, HRI was *compensated* for the sale of fly ash and other CCPs under various formulas: a percentage of gross sales; a fixed per-ton price for CCPs sold; or a combination of a fixed component, a variable component and a percentage of net proceeds (sales revenues minus third-party transportation and handling costs for delivery to customer only).

Additionally, regarding mutual risk vis-à-vis losses, HRI bore the risk of any losses it suffered in fulfilling these contractual duties. While HRI was allowed to account for some of its costs in the calculation of its compensation under the various agreements, it bore the responsibility of many of the costs associated with its contractual duties. HRI also bore the additional risk in some situations of required shortfall payments for its failure to sell designated tonnage amounts of

21

CCPs. Thus, the risk of whether its ultimate calculated compensation under the various marketing agreements covered or exceeded all of its other costs and resulted in profits was borne solely by HRI, such that JRC cannot demonstrate a genuine issue of material fact as to this element either.

Accordingly, JRC is unable to carry its burden of demonstrating the existence of an issue of material fact as to whether the marketing agreements HRI entered into with Cleco or Entergy, or NRG/LaGen, constituted joint ventures or, consequently, whether a horizontal conspiracy in restraint of trade existed by virtue of HRI's actions as a pure, non-vertical, direct competitor of NRG/LaGen.

**B. Unlawful Common Sales Agency Agreement**

Turning next to JRC's claim of a horizontal conspiracy through the use of a common sales agency, we note that not all common selling agency agreements violate antitrust laws. See *Virginia Excelsior Mills, Inc. v. Federal Trade Commission*, 256 F.2d 538, 541 (4th Cir. 1958). However, such an agreement does violate antitrust laws where it is used as a concerted action by two or more horizontal competitors to accomplish a purpose that could not be lawfully accomplished "by a direct agreement among the participating producers." *Id.*

In *Virginia Excelsior Mills, Inc.*, the United States Fourth Circuit Court of Appeals held that an agreement among competing producers to eliminate competition among themselves was a *per se* violation of Section 1 of the Sherman Antitrust Act. The competing producers organized a new corporation, the stock of which the competing producers owned and the board of directors for which was selected from among the competing producers. The new corporation then entered into **identical** contracts with each producer-stockholder appointing the new corporation as each producer's exclusive sales agent. Moreover, by agreement of the producers, orders were to be allocated among them on the basis of their relative productive capacities, and no producer would increase its productive capacity.

*Virginia Excelsior Mills, Inc.*, 256 F.2d at 539-540. As such, the underlying agreement of these competitors to use a common selling agency to achieve their unlawful purpose was well established by evidence of a direct agreement or conspiracy among all of these competitors through the use of a separately created entity, owned and controlled by the horizontal competitors.

Nonetheless, given the absence of any evidence herein of such direct agreement among the power companies to use their common sales agency HRI for an unlawful purpose, JRC contends that it was never obligated to prove the horizontal agreement by direct communications among the power companies. Rather, citing *United States v. Masonite Corporation*, 316 U.S. 265, 275, 62 S. Ct. 1070, 1075-1076, 86 L. Ed. 1461 (1942), JRC asserts that a plaintiff may establish the existence of a horizontal agreement by offering direct evidence of a common agent engaging in prohibited conduct for the group of horizontal competitors pursuant to the "express delegation, acquiescence, or understanding" of the competing horizontal members. See *Masonite*, 316 U.S. at 276, 62 S. Ct. at 1076. Moreover, JRC argues that it presented a genuine issue of fact of a horizontal conspiracy by offering direct evidence of HRI setting uniform market prices and controlling output pursuant to contractual delegation and/or acquiescence of Cleco, Entergy, and NRG/LaGen.

However, based on our *de novo* review of the evidence submitted, there is no evidence that HRI controlled output of fly ash or any other CCPs produced by Cleco, Entergy, or NRG/LaGen. To the contrary, a review of the marketing agreements of record demonstrates that the power companies controlled their own energy production levels and their own internal use of CCPs they produced, which, in turn, determined the quantity of CCPs made available for marketing. The Entergy marketing agreements for the Nelson Power Station indicate that the amount of ash available under the marketing agreement would be determined by

the operation of Nelson Unit 6, which operation would be controlled by Entergy "in its absolute discretion." Entergy further reserved the right to use any part of the CCPs produced by Nelson Unit 6. Similarly, the Cleco marketing agreements contained provisions indicating either that the quantity of ash produced would vary depending on many factors involved in plant operations, that Cleco made no guarantee as to quantity of ash that would be made available, or that Cleco would not alter its power supply to ensure a volume of ash. Cleco also reserved the right to use CCPs for its own benefit and even reserved the right to donate fly ash produced at the Dolet Hills Power Station for various purposes. Finally, the LaGen/HRI Agreement also provided that LaGen expressly made no warranties as to the quantity of CCPs and reserved the right to use CCPs produced at Big Cajun II for its own purposes.

Moreover, JRC failed to demonstrate the existence of a genuine issue of material fact as to the alleged acquiescence by Cleco or Entergy in any such scheme in a concerted effort to restrain trade. The record demonstrates that HRI contracted with these power companies years or even decades apart. HRI (or its predecessors) first contracted with Cleco (and its predecessors) in 1981 with regard to fly ash and other CCPs produced at the Rodemacher Power Station and thereafter in 2003 for fly ash produced at the Dolet Hills Power Station. HRI (or its predecessors) first contracted with Entergy (and its predecessors) in 1986 for ash marketing services at the Nelson Power Station. By contrast, it did not contract with NRG/LaGen until 2011.

Further, there is no evidence that either Cleco or Entergy had any knowledge of HRI's marketing agreements with each other or with NRG/LaGen, or of HRI's marketing efforts on behalf of those other entities. Nor is there any evidence that, in executing these marketing contracts years apart, the power companies agreed to, or even later acquiesced in, a scheme to fix market prices and control output.

24

Accordingly, we conclude that JRC failed to demonstrate the existence of a genuine issue of material fact as to an alleged horizontal conspiracy by Cleco, Entergy, and NRG/LaGen, implemented by HRI as their common sales agency, by either contractual delegation or acquiescence.

## C. Hub-and-Spoke Conspiracy

JRC next contends that it demonstrated a genuine issue of material fact of a horizontal agreement in restraint of trade by offering circumstantial evidence of a "hub-and-spoke" conspiracy. A hub-and-spoke conspiracy is one in which an entity at one level of the market structure, the "hub," coordinates an agreement among competitors at a different level, the "spokes." *U.S. v. Apple, Inc.*, 791 F.3d 290, 314 (2nd Cir. 2015), cert. denied sub nom., ___ U.S. ___, 136 S. Ct. 1376, 194 L. Ed. 2d 360 (2016). A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes. *In re Musical Instruments and Equipment Antitrust Litigation*, 798 F.3d 1186, 1192.

Where no direct evidence exists for the third element, a horizontal agreement among the spokes (or competitors), courts evaluate circumstantial evidence, called "plus factors," to determine whether a plaintiff's evidence is more probative of conspiracy than of conscious parallel behavior. *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1294 (M.D. Fl. 2016). Plus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct, but largely consistent with explicitly coordinated action. Accordingly, they may raise an inference of conspiracy. *Id.* at 1294-1295. These plus factors include: (1) a common motive to conspire, (2) evidence showing that the parallel acts were against the apparent individual economic self-interest of the alleged

25

conspirators, (3) evidence of a high level of interfirm communications, and (4) historically unprecedented changes in pricing structure made at the very same time by multiple competitors for no other discernible reason. *Id.* at 1295; *Apple, Inc.*, 791 F.3d at 315. JRC contends on appeal that it presented factual support demonstrating issues of material fact as to these plus factors and, thus, that summary judgment dismissing its *per se* antitrust claims was inappropriate.

First, regarding a common motive to conspire, JRC contends that there was a common motive to conspire because of excess supply of CCPs and Big River and HRI's "historical pricing competition," which "tended to" drive prices of CCPs downward or neutral. Based upon our *de novo* review of the summary judgment evidence, JRC did present some evidence from its economist that the price of CCPs was generally trending downward from 2008 through 2010.

Secondly, JRC contends that the each power company's separate marketing agreement with HRI was not in the individual company's economic self-interest where each "contractually relinquished [its] right to individually compete for CCPs sales" by authorizing HRI to centrally manage and control prices and output. However, JRC presented *no* evidence that the marketing agreements, entered into by the power companies years and even decades apart, were against their individual self-interests. Regarding controlling output, as discussed above, output of CCPs is determined by energy production levels, which are controlled by the individual power companies, and the quantity of CCPs made available for marketing is further dependent upon the power companies' discretionary use of the CCPs they produce. Additionally, the Cleco contracts of record for the Dolet Hills Power Station required minimum sales levels of CCPs with penalty payments for failure to meet those minimums, and the Entergy marketing agreement for the Nelson Power Station specifically provided that the marketing contractor would "use its best efforts to market **all ash**" delivered under the agreement. (Emphasis

added). These contractual provisions demonstrate that the power companies' overall objective was simply to remove CCPs from their premises – not, as JRC suggests, that they conspired through the use of marketing agreements to authorize HRI to control prices against their individual self-interests.

As to interfirm communications, JRC points to a letter from HRI to NRG/LaGen evidencing a possible scheme to raise prices. In the letter, HRI, in an attempt to gain the NRG/LaGen marketing contract, indicated that HRI managed "all other sources of C-618 fly ash produced in the State of Louisiana" and that HRI's involvement with Big Cajun II "could present significant opportunities for both companies to increase sales and to maximize pricing of the products."

Regarding the fourth plus factor, JRC did present evidence that the price of CCPs in Louisiana, while generally trending downward from 2008 through 2010, leveled off in 2011, just as the LaGen/HRI Agreement was executed, and then began to rise. Additionally, JRC offered evidence that once HRI entered into the LaGen/HRI Agreement, HRI instituted an initiative to raise prices for CCPs produced by Big Cajun II because HRI believed that the prices previously charged by Big River were below the "competitive rate." This initiative was further evidenced by HRI's email communication to one customer, identified as a former Big River customer, incrementally raising prices to that customer for an unidentified product over a seven-month period from February to September of 2011, shortly after HRI became the marketing agency for NRG/LaGen.

Nonetheless, based on our *de novo* review of the limited evidence upon which JRC relies to support the plus factors, we conclude that JRC did not demonstrate a genuine issue of fact as to whether a horizontal agreement among the power companies should be inferred. Specifically, while the evidence offered suggests that CCPs prices were generally trending downward from 2008 to 2010 and thereafter stabilized and began increasing, the graph presented by JRC's

economist is not broken down by prices charged individually by Cleco, Entergy, and NRG/LaGen. Thus, it is impossible to discern from the graph which of the power companies may have experienced decreasing prices or whether the upward trend in prices was a result of an increase in prices "by multiple competitors." See *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d at 1295.

Additionally, as discussed above, the language of the various marketing agreements does not suggest that they were against the individual economic self-interests of the power companies. And the written communications from HRI to NRG/LaGen represent **vertical** communications between a marketing agency and one producer, wherein HRI suggested that HRI and NRG/LaGen could maximize pricing. JRC offered no evidence of any interfirm communications among or between the horizontal power companies Cleco, Entergy, or NRG/LaGen to suggest a conspiracy among them, and no communications between HRI and Cleco or Entergy, much less a high level of such communications. Moreover, the written communication from HRI to NRG/LaGen and the evidence of HRI's initiative to raise prices for CCPs produced by Big Cajun II indicates price changes for that one CCPs producer alone. *Id.*

Accordingly, JRC failed to carry its burden of demonstrating a genuine issue of material fact as to whether a horizontal agreement among the power companies should be inferred. As such, there is likewise no genuine issue of fact as to whether HRI, Cleco, Entergy, and NRG/LaGen entered into a hub-and-spoke conspiracy. Having failed to demonstrate an issue of fact as to a horizontal conspiracy under any of the theories it has advanced, JRC has failed to establish that HRI and NRG/LaGen are not entitled to summary judgment dismissing JRC's *per se* antitrust claims. Thus, the portion of the trial court's December 4, 2019 judgment dismissing JRC's *per se* antitrust claims is likewise affirmed.

## Trial Court's Denial in Part of HRI's and NRG/LaGen's Motions for Partial Summary Judgment Seeking Dismissal of JRC's La. R.S. 51:123 Monopoly Claim
### (HRI's and NRG/LaGen's Assignments of Error Nos. 1 & 2)

In their appeals of the trial court's December 4, 2019 judgment, HRI and NRG/LaGen both contend that the trial court erred in denying in part their motions for partial summary judgment and refusing to dismiss JRC's monopoly claims under La. R.S. 51:123. HRI and NRG/LaGen each assert that the trial court erred in failing to grant its motion for summary judgment on the monopoly claims: (1) where JRC did not suffer antitrust injury; and (2) where JRC failed to define a geographic market.

With regard to antitrust injury, a plaintiff suffers an antitrust injury only if its loss is the type of loss that the claimed antitrust violation is likely to cause. *HPC Biologicals, Inc.*, 194 So. 3d at 797. "Antitrust injury" is defined as the type of injury that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The requirement of an antitrust injury ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendants' behavior. *Id.* A plaintiff must allege a causal connection between its alleged injury and the anticipated anticompetitive effect of the specific practice that allegedly violates antitrust law. *BRFHH Shreveport, LLC v. Willis Knighton Medical Center*, 176 F. Supp. 3d 606, 626 (W.D. La. 2016).

HRI and NRG/LaGen assert that JRC did not suffer antitrust injury because it did not pay increased prices and, thus, did not suffer the "anticipated anticompetitive effect" of an alleged monopoly. According to HRI and NRG/LaGen, the causal connection here is lacking. They contend that the anticipated anticompetitive effect of an alleged monopoly is that the monopolist will raise prices to anticompetitive levels. Asserting that JRC never bought C-618

fly ash directly from LaGen, NRG or HRI and, thus, never paid increased prices, defendants claim that JRC did not suffer the harm a monopoly is likely to cause.

However, the antitrust injury claimed by JRC is not that it was forced to pay higher prices for CCPs, but rather that it suffered antitrust injury from HRI's refusal to deal with JRC. A unilateral refusal to deal generally is not unlawful. However, a monopolist's refusal to deal becomes actionable under the antitrust laws where the refusal is designed to have an anticompetitive effect, whether to gain market share, to drive up prices, or to obtain some other illegal goal. *Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial, Inc.*, 919 F.2d 1517, 1522 (11th Cir. 1990), cert. denied sub nom., 502 U.S. 815, 112 S. Ct. 68, 116 L. Ed. 2d 43 (1991). Thus, monopolistic or other anticompetitive intent is the key factor in determining whether an antitrust violation has occurred. See *Id.*

In the instant case, JRC presented evidence suggesting that HRI refused to deal with JRC once HRI became the marketing agency for NRG/LaGen. However, questions of material fact remain as to this issue. HRI and NRG/LaGen contend, nonetheless, that the sole exception to a company's lawful right to refuse to deal with its competitors is where a monopolist seeks to terminate a prior voluntary course of dealing with a competitor. See *In re Elevator Antitrust Litigation*, 502 F.3d 47, 52 (2nd Cir. 2007). According to HRI and NRG/LaGen, JRC cannot establish a refusal-to-deal claim because JRC had no preexisting relationship with HRI or NRG/LaGen.

However, JRC notes that HRI was representing Cleco, Entergy, and NRG/LaGen as their exclusive marketing agency for CCPs sales at the time HRI allegedly refused to deal with JRC. Accordingly, JRC asserts that HRI's actions on behalf of all of the power companies would have effectively prevented JRC from dealing with any of these power companies. Additionally, JRC contends that a genuine issue of fact remains as to whether it had a prior legally enforceable

relationship with NRG/LaGen. Considering the foregoing and based on our review of the summary judgment evidence, we conclude that disputed issues of fact remain as to whether JRC suffered antitrust injury because of a refusal to deal.

With regard to the relevant geographic market, the geographic element of the relevant market consists of the area in which sellers of the defendants' product operate and to which buyers can practicably turn to obtain that product. *State ex rel. Ieyoub v. Racetrac Petroleum, Inc.*, 2001-0458 (La. App. 3rd Cir. 6/20/01), 790 So. 2d 673, 679. Thus, the issue of geographic market is also a fact-intensive inquiry. Based on our *de novo* review of the evidence submitted, we likewise conclude that issues of fact remain as to the relevant geographic market. Accordingly, HRI and NRG/LaGen were not entitled to dismissal of JRC's monopoly claims on summary judgment. As such, the portion of the trial court's December 4, 2019 judgment denying in part HRI's and NRG/LaGen's motions for partial summary judgment as to JRC's monopoly claims is affirmed.

## CONCLUSION

For the above and foregoing reasons, the trial court's December 4, 2019 judgment, denying the motion for partial summary judgment of plaintiff, John River Cartage, Inc., and granting in part and denying in part the motions for partial summary judgment filed by defendants, Headwaters Resources, Inc. and Louisiana Generating, LLC and NRG Energy, Inc., is affirmed. Costs of this appeal are assessed one-third to John River Cartage, Inc., one-third to Headwaters Resources, Inc., and one-third to Louisiana Generating, LLC and NRG Energy, Inc.

**AFFIRMED.**